FILED

2005 MAY 17 P 4: 58

US DISTRICT COURT
BRIDGEPORT CT

MICHAEL VERRILLI                         :
                                         :      Civil Action No.:
                    Plaintiff            :      3:03-CV-0541 (WWE)
                                         :
                                         :
                                         :
SIKORSKY AIRCRAFT CORPORATION,           :
AND TEAMSTERS LOCAL 1150                  :      May 16 , 2005
                                         :
                    Defendants           :
                                         :

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMENT

## FACTS

The Plaintiff in the instant case was employed by the Defendant, Sikorsky Aircraft Corporation from March 5, 1979 until he was discharged on March 30, 2000. (Plaintiff's affidavit, Exhibit A) During the twenty-one (21) years of employment with the Defendant, he performed various manufacturing duties assembling helicopters. (Exhibit A) The Plaintiff has alleged he was wrongfully discharged without just cause in violation of collective bargaining agreements which applied to his job position.  The Plaintiff has instituted the instant case against his former employer, the Defendant, Sikorsky Aircraft Corporation, pursuant to the labor Management Relations Act 29 U.S.C section 185 and his Union, the Defendant, Teamsters Local No. 1150, International Brotherhood of Teamsters alleging a violation of the duty of fair representation concerning the

processing of Plaintiff's grievance arising from his discharge by the Defendant, Sikorsky Aircraft Corporation.

Prior to September, 1999 the Plaintiff was not subject to drug testing by his employer, the Defendant Sikorsky Aircraft Corporation. (Exhibit A) In September, 1999 a meeting was held by the Defendant, Sikorsky, with employees of the blades and composite department(s). The Defendant, Sikorsky, informed the blades and composite department employees including the Plaintiff that a new department was going to be organized for the overhaul and repair of commercial helicopter blades. (Exhibit A)The overhaul and repair work for commercial helicopter blades was going to be performed in the future at the Stratford plant rather than at the Bridgeport plant which had previously performed overhaul and repair work. (Exhibit A) The employees were informed that the overhaul and repair work on the commercial blades would be FAA covered work and as a result FAA drug testing procedures would apply. (Exhibit A) Although the Plaintiff had not been specifically selected to actually perform the FAA covered work he was one of the first employees tested for drugs. (Exhibit A) On or about September 9, 1999 the Defendant required the Plaintiff to provide a urine sample for drug testing. (Exhibit A) At the time of the requested drug test there was no reasonable suspicion that the Plaintiff was under the influence of drugs and he had not performed any FAA covered work nor was he selected to actually perform the work. (Exhibit A) The urine sample was subsequently tested and allegedly was positive for marijuana. (Exhibit B) A second separate and independent test was never conducted on the split sample of the urine specimen.

(Exhibits A and B) The Defendant was also never informed that he could request a test on the split sample within 72 hours of being informed of the positive test. (Exhibit A) As a result a split sample test was never conducted to confirm the initial positive test result for marijuana. (Exhibits A and B)

Subsequent to the alleged positive drug test of September 9, 1999 the Plaintiff continued to be employed by the Defendant, Sikorsky Aircraft Corporation. As a condition of his continued employment the Defendant, Sikorsky Aircraft Corporation required the Plaintiff to be drug tested monthly. (Exhibit A) The Plaintiff submitted to monthly drug tests through March 2000. On or about March 21, 2000 the Plaintiff submitted to a monthly drug test as required by his employer although he was not performing any FAA covered work (Exhibit A and C) . The Defendant has alleged that the Plaintiff's drug test of March 2000 was positive for cocaine. (Exhibit C) The Defendant discharged the Plaintiff on or about March 30, 2000 for allegedly having two positive drug tests. (Exhibit A).

Contrary to the Defendants' motions for summary judgment questions of material fact exists as to whether the Plaintiff was discharged without just cause. Questions of material fact also exist as to whether the Defendant, Union, breached its duty of fair representation. Finally, sufficient questions of fact exist so as to preclude summary judgment on the Defendant's time limitation claim.

**STANDARD FOR SUMMARY JUDGMENT**

3

The Second Circuit reviewed the rules for summary judgment after stating, "Considering how often we must reverse a grant of summary judgment, the rules for when this provisional remedy may be used apparently need to be repeated." Gallo v. Prudential Residential Services, 22 F.3d 1219 (2nd Cir. 1994).

First, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. See Heyman v. Commerce Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975). In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of he party against who summary judgment is sought. See Eastway Construction Corp. vs. City of New York. 762 F.2d 243, 249 (2d Cir. 1985) cert. denied, 484 U.S. 918, 108, S. Ct. 269, 98 L.Ed. 2d 226 (1987). Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. See Celotex vs. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); DiCola v. SwissRe Holding North America), Inc., 996 F.2d 30, 32 (2d Cir. 1993). When no rational jury could find in favor on the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper. See Dister vs. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988).

Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge, . . .

The evidence of the non-movant is to be believed, and all justifiable inferences

are to be drawn in his favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255

(1986)

## ARGUMENT

## I. QUESTIONS OF FACT EXISTS AS TO WHETHER THE DEFENDANT BREACHED THE COLLECTIVE BARGAINING AGREEMENT IN DISCHARGING THE PLAINTIFF

Section 301 of the Labor Management Relations Act ("LMRA") creates a

federal cause of action and grants district courts jurisdiction to adjudicate labor

disputes involving breaches of collective bargaining agreements, so that the

parties to those agreements have access to civil remedies for breach of contract.

<u>Textile Workers Union of Am. v. Lincoln Mills of Ala.</u>, 353 U.S. 448, 455 (1957).

Section 301 provides:

> Suites for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount of controversy or without regard to the citizenship of the parties.

29 U.S.C.§185 (a).

The Collective Bargaining Agreement in the instant case specifically

provides that employees of the Defendant, Sikorsky , covered by the collective

bargaining agreement, which includes the Plaintiff , cannot be discharged without

just cause. (Exhibit D , CBA, Section 6-20)

For over twenty (20) years the Plaintiff worked for the Defendant, Sikorsky Aircraft and during that time the Plaintiff was not subject to any drug testing rule or regulations at the Defendant. (Plaintiff's affidavit)  During the over twenty (20) years of his employment for the Defendant, the Plaintiff performed various manufacturing duties in the assembly of helicopters.  During his employment the Plaintiff was progressively given raises and his performance was "exceeded expectations". (Plaintiff's affidavit)  The Defendant, Sikorsky, in the instant has alleged that after (20) years of employment without required drug testing, the Plaintiff was suddenly required to be drug tested.

The drug testing provisions of the Collective Bargaining Agreement in the instant case only applied to employees who were performing FAA covered work. The Collective Bargaining Agreement in the instant case limits "random drug and alcohol testing program for those employees as specified in the Federal Aviation Administration Anti-Drug and Alcohol Program rule..." ( Exhibit D, CBA pg. 106).  The Defendant, Sikorsky, in the instant case has alleged that the Plaintiff was subject to this FAA random drug testing program in September, 1999.

Contrary to the Defendant's claim, the Plaintiff never performed any work which was subject to the FAA drug testing rules. (Plaintiff's affidavit )  The FAA regulations only required drug testing of employees who are "performing a safety sensitive function for an employer."  (Exhibit E, 14 CFR, Appendix I to Part 121, pg. 567).  An "employer" is defined in FAA rules codified in 14 C.F.R. as "a part 121 or 135 certificate holder."  (Exhibit E, 14 CFR, Appendix I to Part 121 pg.

567) The Defendant in the Motion for Summary Judgment has failed to provide any evidence that the Defendant, Sikorsky, is a "part 121 (or part 135) certificate holder." For this basis alone, the Defendant's Motion for Summary Judgment should be denied.

The FAA drug testing rules may also apply to employees of a contractor company doing safety sensitive work. The Plaintiff has failed to prove that it was a "contractor company… that has employees who perform safety – sensitive functions by contract for an employee." The Defendant has failed to present any evidence it is a "contractor company" and has failed to present any document reflecting it was under "contract" to perform "safety  sensitive functions" for an FAA regulated "employer"  (Exhibit E, 14 C.F.R. Part 121, App. I, pg. 567).  The Defendant should not be able to be successful in summary judgment when it provides conclusory statements that the Plaintiff was performing FAA safety sensitive functions when it has failed to provide any proper evidence to support such a contention.  The Defendant has failed to even state the name of the company it was alleging performing the blade overhaul work for.  The Defendant should not be able to be successful on summary judgment when it wants the court to believe it was performing "safety sensitive" work without knowing the basis for this contention.  The Defendant has failed to prove that it was doing work for an FAA regulated employer.

Even if the Defendant is considered an "employer" or "contractor employer" doing FAA work, the Defendant has failed to prove that no questions

of fact exist as to whether the Plaintiff was subject to the FAA drug testing policies.

The code of Federal Regulations states that an employee is "performing (a safety-sensitive function)... during any period in which he or she is actually performing, ready to perform or immediately available to perform such function." (Exhibit E, 14 C.F.R. Appendix 1, to Part 121, pg. 546). A safety sensitive function includes "Aircraft maintenance or preventable maintenance duties" for employers or contractors covered by the FAA. (Exhibit E, 14 C.F.R. App. 1, pg. 568) There is no question of fact in the instant case that the Plaintiff never actually performed FAA safety sensitive work. The Plaintiff has indicated that he never performed such work in the composite department where he was assigned. (Plaintiff's affidavit) The Plaintiff's work in the composite department involved working on military aircraft which was not subject to FAA drug testing policies. (Plaintiff's affidavit)  Harvey Jackson, the Defendant's Union representative stated in his deposition that any FAA "covered" work would be reflected by the paperwork which accompanied the part to be worked on. (Exhibit F ,Depo., H. Jackson, pg.36-37 ) The Plaintiff has stated that he never did FAA covered work which work would have been accompanied by paperwork reflecting it was FAA work. (Exhibit A) The Defendant has not presented any statement or documents that the Plaintiff performed any FAA covered work.  The Plaintiff also could not have been "ready to perform" FAA covered work since he worked on the military aircraft not covered by the FAA drug testing policies. (Exhibit A) In addition, the Plaintiff was not selected as an employee who would actually be

8

performing FAA covered work.(Exhibit A) Just because some other individuals in his department may be performing FAA covered work does not automatically require the Plaintiff to be drug tested pursuant to FAA regulations.

Even if the Plaintiff was somehow suddenly subject to drug testing the Defendant, Sikorsky, did not properly conduct drug testing of the Plaintiff. When the Plaintiff was initially requested to provide a drug test on September 9, 1999, a urine sample was taken of the Plaintiff. (Exhibit A, Plaintiff's affidavit) (Exhibit B ) Contrary to 49 C.F.R. Section 4033, pg. 577, (Exhibit G) the Plaintiff was not "advised" that he had 72 hours to request a test of the split specimen he provided for testing. (Exhibit G)(Plaintiff's affidavit)  When a request for testing of a split specimen is made, the split sample must be sent to another laboratory for analysis.  49 C.F.R. Section 40.33, pg. 577. (Exhibit G) The drug testing documents for the Plaintiff's September, 1999 drug test  prepared by the Defendant, Sikorsky, confirms that there was no testing was performed on the Plaintiff's split urine sample by a separate lab. (Exhibit B ) Similarly, none of the Defendant's drug testing documents reflect that the Plaintiff was "advised"  that he had seventy-two (72) hours after the initial positive test to request a split sample test. (Exhibit B )  There is no question of fact that the drug testing of the Plaintiff was not properly conducted.

In the instant case not only should the Plaintiff not have been drug tested but the drug testing was not properly conducted.  The  Defendant, Sikorsky, breached the Collective Bargaining Agreement for discharging the Plaintiff without cause.  The Plaintiff was not subject to FAA regulations for drug testing.

Since the Plaintiff was not subject to FAA drug testing rules, it was also a violation of state law for the Plaintiff to be drug tested and it was a violation of state law in the manner in which the Plaintiff was drug tested. As has been indicated above prior to September, 1999 the plaintiff was not subject to drug testing. On or about September 9, 1999 the Plaintiff was required to provide the Defendant with a urine sample for drug testing.  At the time of the requested drug test there was no reasonable suspicion that the Plaintiff was under the influence of drugs.  The urine sample was subsequently tested and allegedly was positive for marijuana.  A second "separate and independent" test, as required by law, was not performed to confirm the alleged positive test result.  Connecticut General Statute section 31-51x provides in pertinent part;

> "(a) No employer may require an employee to submit urinalysis drug test unless the employer has reasonable suspicion that the employee is under the influence of drugs or alcohol which adversely affects or could adversely affect such employee's job performance."

Drug tests which are permitted by law are governed by Connecticut General Statute section 31-51u which states in pertinent part;

> "(a) No employer may determine an employee's termination … unless (1) the employer has given the employee a urinalysis drug test, utilizing a reliable methodology, which produced a positive result, **and (2) such positive test result was confirmed by a second urinalysis drug test, which was separate and independent from the initial test,** utilizing a gas chromatography and mass spectrometry methodology or a methodology which has been determined by the Commissioner of Public Health to be as reliable or more reliable than the gas Chromatography and mass spectrometry methodology." (Emphasis added)

10

In the instant case it is uncontroverted that a second "separate and independent" drug test was not done to confirm the allegedly first positive test result of the urine sample taken from Plaintiff on March 9, 2000. As a result the drug test was also not performed in conformity with state law and the Plaintiff was discharged without just cause.

## II. SUFFICIENT QUESTIONS OF MATERIAL FACT EXISTS AS TO WHETHER THE DEFENDANT, UNION, BREACHED THEIR DUTY OF FAIR REPRESENTATION.

The duty of fair representation is akin to a fiduciary relationship, and therefore "a union owes employees a duty to represent them adequately as well as honestly and in good faith." Air Line Pilots Association v. O'Neill, 499 U.S. 65, 75, 111 S. Ct. 1127, 1134 (1991). Put another way, the duty of fair representation "includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise (the union's) discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 77, 87 S. Ct. 903, 910 (1967); see also Ramey v. Dist. 141, International Association of Machinists, 378 F.3d 269, 276-77 (d Cir. 2004) (union breaches duty of fair representation when its conduct toward a member is arbitrary, discriminatory, or in bad faith); Cruz v. Local Union No. 3 of the International Bhd. Of Electric Workers, 34 F.3d 1148, 1153 (2d Cir. 1994) (same);

A union may not arbitrarily ignore a meritorious grievance or process it perfunctorily. Ryan v. The New York Newspaper Printing Pressmen's Union No. 2, 590 F.2d 451, 455 (2d Cir. 1979). In addressing what constitutes arbitrary

11

conduct, the Second Circuit explained "arbitrary conduct amounting to a breach is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.'" Cruz v. Local Union No. 3 of the IBEW, 34 F.3d 1148, 1153 (2d Cir. 1994), (citing NLRB v. Local 282. Int'l Bhd. Of Teamsters, 740 F.2d 141, 147 (2d Cir. 1984).

When a plaintiff alleges a union's breach of its duty of fair representation, the complaint[] should be construed to avoid dismissal[]. '"Kavowras v. N.Y. Times Co., 328 F.3d 50, 54 (2d. Cir. 2003) (quoting Czosek v. O'Mara, 397 U.S. 25, 27 (1970); see also Eatz v. DME Unit of Local Union Number 3, 794 F.2d 29, 34 (2d Cir. 1986).

Material questions of fact exist in the instant case that the Defendant, Union, not only inexplicably delayed the processing of the Plaintiff's grievance and arbitration but processed it in a perfunctory fashion. A union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion. Photo – Engravers' Union No. One-P, 306 F. Supp. 1266, 1271 (S.D.N.Y. 1969), aff'd, 431 F.2d 1205 (2d Cir. 1970).

Interpreting the allegations of the complaint in favor of the plaintiff, the plaintiff in the instant case sought union representation in response to his employers', the Defendant Sikorsky's request that he be required to submit to drug testing which led to his discharge from employment. The Plaintiff in the

instant case requested that a grievance be filed on his behalf after his discharge. In response a grievance was filed on behalf of the Plaintiff by the Defendant, Union. Pursuant to the terms of the collective bargaining agreement, the Plaintiff's grievance went through the first three steps of the grievance procedure process. (Exhibit H ) After the first three grievance steps, the Plaintiff's grievance was appealed to arbitration. (Exhibits A and H) The written grievance form has a notation that it was appealed to arbitration (on the bottom of the Plaintiff's grievance form after "disposition Step 3" a notation is made by the union "Appeal to arb") (Exhibit H). A correspondence was also sent by the Defendant, Union, to the Defendant, Sikorsky requesting that the Plaintiff's grievance be placed on the arbitration list (Exhibit I ).

Contrary to these documents reflecting that the Plaintiff's grievance was claimed for arbitration, the Defendant, Union, now indicates that it was "pointless" to proceed to arbitration on Plaintiff's grievance. Contrary to this belated claim, the Defendant, Union, never informed the Plaintiff that his grievance was "pointless" during the initial three steps of the grievance process. Instead up to the time the Plaintiff had to file suit, the Plaintiff was continuously informed that he should be patient and wait while his grievance was being processed through the necessary steps, which included arbitration. (Exhibit A)

The Defendant, Union, states in its Motion for Summary Judgment that the Plaintiff has no evidence that the drug tests administered to him were improperly performed. (Defendant, Union's memorandum of law, pg. 11). Contrary to this assertion, the drug tests administered to the Plaintiff were improperly performed.

13

The president of the Defendant's Union stated in his deposition that a "normal and standard practice" in drug testing of employees would be to have the split sample tested, "Just to be certain that it (the testing) didn't have a false positive (Deposition of Harvey Jackson, pg. 54). Mr. Jackson also admitted that whether the split sample also tested positive would be an important factor to consider in deciding whether to proceed to arbitration. Mr. Jackson in answering a question concerning the split sample in determining whether to proceed to arbitration stated as follows;

Q. (By Plaintiff's Counsel): "So, in order to make it, your decision-making process, as to whether to take this matter to arbitration, that would be an important thing for you to know, what happened to the (split sample) test?"

A. (By H. Jackson) "Absolutely."

(Exhibit F, Depo. of H. Jackson, pg.54).


Mr. Jackson was also asked if the split sample was tested pertaining to the Plaintiff's first drug test. Upon being asked if a split sample test was done for the Plaintiff, Mr. Jackson initially indicated he did not know if this "normal and standard" procedure was done. (Exhibit F, Deposition of H. Jackson, pg. 54-55). Upon reviewing the Union documents he was requested to bring to his deposition concerning the Plaintiff's drug testing and grievance Mr. Jackson for the first time realized that a test at the split sample was not conducted (Exhibit F, Deposition of H. Jackson pg. 56). The Defendant, Union's omission in failing to determine that the "standard and normal" split test was not performed is "so egregious, so

14

far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary. "Gagliardi v. East Hartford Housing Authority, case No. 3:02 CV478, January 7, 2004 (D. Conn., Burns, J.) (Copy of court decision attached hereto as Exhibit M) citing, Cruz v. Local Union No. 3 of IBEW, 34 F.3d 1153 (2nd Cir. 1994). The Connecticut District Court in Gagliardi denied the Defendant's motion to dismiss the Plaintiff's claim against the Defendant, Union for beach of the duty of fair representation. (Exhibit M).

The Defendant, Union, in the instant case also improperly treated the Plaintiff different from other employees. The Defendant, Union, president acknowledged that a group of employees had been discharged for use sale and/or possession of the drug Oxycontin on the Defendant, Sikorsky's, property during working hours. (Exhibit F,Deposition of H. Jackson, pg. 48-51). The grievances for these individuals were pending during the time period in which the Plaintiff's grievance was pending. (Exhibit A,Plaintiff's affidavit). The Defendant, Union,, decided to proceed to arbitration on the grievances involving the Oxycontin cases which discharges involved use, possession and/or sale of drugs on company premises. The collective Bargaining Agreement specifically prohibits possession and use of drugs on company premises; not only did the Defendant, Union, proceed to arbitration on the Oxycontin cases but the arbitrator reinstated to employment a number of these employees who had been discharged (Exhibit F, Deposition of H. Jackson at pg. 49-50). In contrast, the Plaintiff was never accused of use, possession or sale of drugs on company property. (Exhibit A, Plaintiff's affidavit; Exhibit F, Deposition of H. Jackson pgs.

15

51-2). But the Defendant, Union, did not follow through with arbitration on the Plaintiff's grievance. The Defendant, Union's failure to follow through with arbitration on the Plaintiff's discharge and their proceeding to arbitration on the more severe drug cases involving sale, use and possession on company property creates a question of fact as to whether the Defendant, Union, acted in a discriminatory and arbitrary manner.

Further questions of material fact exist as to whether the Defendant, Union, breached its duty of fair representation. The Plaintiff was one of the initial employees from the blade composite shop to be drug tested in September, 1999. (Exhibit A). After the testing had started several employee complaints arose that the testing commenced too soon and requested that testing be delayed. (Exhibit A). As a result, the drug testing was delayed for approximately thirty (30) days. (Exhibit A). The Plaintiff was not given this benefit in the change of drug testing procedures. Mr. Jackson at his deposition did not recall the drug testing being "per se suspended" but did recall a discussion between the Defendant, employer and Defendant, Union, in which if an employee admitted he might test positive it would "not count" as a strike in the two strikes and out policy. (Exhibit F, Deposition of H. Jackson at pgs. 31-32).

With regard to the delayed testing or the "no count" procedure the Plaintiff was not afforded the benefit of this procedure by his Union and instead was made to go through a testing procedure which the Defendant, Union, subsequently had changed to benefit its other members. Once again questions of fact exist as to whether the Plaintiff was treated differently and/or whether the

16

Union made an arbitrary decision not to continue to proceed with arbitration on the Plaintiff's grievance.

## III. SUFFICIENT QUESTIONS OF MATERIAL FACT EXIST AS TO WHEN THE PLAINTIFF'S CAUSE OF ACTION ACCRUED SO AS TO PRECLUDE SUMMARY JUDGMENT ON THE BASIS OF A SIX MONTH TIME LIMITATION

The Defendant has alleged that the six (6) month statute of limitation period set forth in Section 10(b) of the National Labor Relations Act (NLRA), 29 U.S.C. Section 160(b) applies to the instant case. In Del Costello vs. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct 2281 (1983) the Supreme Court held that the six (6) month time limit provision which when read literally relates only to the filing charges with the National Labor Relations Board, should also apply to so called "hybrid" cases in which employees sue both their employer for breach of its duty of fair representation in mishandling the related grievance and arbitration proceedings Del Costello, 462 U.S. at 154, 103 S. Ct at 2285.

A cause of action based on the duty of fair representation accrues when the Union members know or reasonably should know that a breach of that duty has occurred. Santos vs. District Council, 619 F.2d 963, 969 (2d Cir 1980).

When an action involves a Union's duty of fair representation, the Supreme Court advises the lower courts, as guardians of this duty to construe complaints so as to avoid dismissals. Eatz vs. DME Unit of Local Union Number 3,. 794 F.2d 29, 33-34 (2d Cir. 1986); Czosek vs. O'Mara, 397 U.S. 25, 27, 90 S.

Ct. 770, 772 (1970). An employee's knowledge of the limitation period in a collective bargaining agreement is a question of fact. <u>Schum vs. South Buffalo Railway</u>, 496 F. 2d 328, 331-32 (2d Cir., 1974).

The Plaintiff's grievance was filed on April 3, 2000. (Exhibit H ). After the grievance went through the initial three steps of the grievance process it was appealed to arbitration on or about July 18, 2000. (Exhibit H) On July 18, 2000 the Defendant, Union sent the Defendant, Sikorsky a letter requesting that several grievances, including the Plaintiff's, be added to the list of grievances awaiting arbitration. (Exhibit I ). The Defendant, Unions, documents for the Plaintiff's grievance also reflect that in March, 2002 the Union was still working on the Plaintiff's grievance and obtaining the Plaintiff's medical records from the Defendant, Sikorsky. After the grievance was filed the Plaintiff continued to communicate with the Defendant, Union, concerning the status of his grievance. The Plaintiff was told by the Defendant, Union, that they were working on the grievance and that he would have to wait. (Exhibit A)   The Plaintiff's action against the Defendants' in the instant case accrued after August 2003, when the Plaintiff did not receive a further response from the Defendant, Union, concerning the status of his grievance and arbitration.

The Plaintiff's instant action was filed within six (6) months of the Plaintiff not receiving a response about the status of his  grievance and appeal to arbitration.  The Plaintiff could not have known or reasonably should have known that the union had done nothing to preserve its right to proceed with arbitration on behalf of the Plaintiff.  Construing the facts most favorably to the Plaintiff,

Heyman vs. Commerce and Industry Insurance Co., 534 F.2d 1317, 7320 (2d Cir. 1975) it appears that the Union continuously represented to the Plaintiff that it could successfully file a grievance and proceed with arbitration based on the Plaintiff's termination. The Plaintiff was continually told by the Defendant, Union, through August, 2003 that his grievance was pending for arbitration and that he had to wait and be patient. (Exhibit A) The President of the Defendant, Union, Harvey Jackson told the Plaintiff that arbitration was pending on his grievance and to wait. (Exhibit A).

The instant case is similar to that of the Plaintiff in Ghartey vs. St. John's Queens Hospital, 869 F.2d 160 (2nd Cir. 1989). The court in Ghartey reversed the trial courts entry of summary judgment base on Defendants contention that the Plaintiff has not filed his action within six (6) months of the alleged breach of the Unions duty of fair representation. In Ghartey the union actively represented the Plaintiff's interests in the arbitration proceedings.

The court held that the accrual of the claim against the Union occurred only after the entry of the arbitration' decision. The Plaintiff's claim in Ghartey was that the union did such a poor job during the arbitration proceedings that its representation fell below a threshold of adequacy. The court stated in pertinent part;

> "here we deal not with a union manifestly opposing, rejecting or abandoning the interest or claims of a member, but rather with a union purporting to fulfill its duty of fair representation throughout an arbitration hearing process. In such circumstances, we will not attribute to an unsophisticated employee Instant knowledge of tactical or legal errors made by her own advocate, "the best possible champion of [her] cause," see Childs, 831 F2.d. Rather, the employee is entitled, during the hearing process, to trust in the abilities of her representative and "reasonably

19

believe [the Union] is proceeding in good faith', see <u>King</u>, 785 F.2d at 35, at least until an adverse arbitral decision suggests otherwise. Knowledge of the breach by the Union will not be attributed to Ghartey prior to the issuance of the award. See <u>Samples vs. Ryder Truck Lines, Inc.</u> 755 f.2d 881, 887 n.7 (11th Cir. 1985) <u>Ghartey</u> at pg. 165"

Similarly, in the instant case the Plaintiff and the Defendant were not in an adversarial posture. Plaintiff was under the assumption that the Defendant was processing his grievance for arbitration on his behalf. In March, 2002, two years after the Plaintiff's grievance was filed and subsequent to the Plaintiff's grievance being claimed for arbitration the Defendant, Union, was obtaining medical documentation it needed to process the grievance and arbitration. (Exhibit J  ) The Plaintiff had every reason to assume that the Defendant, Union, still represented him and that it was prepared to take action on his behalf concerning his employer's termination of his  employment.  The breach of the Unions duty was not apparent until after August, 2003  when after repeated communications and responses that the Plaintiff's arbitration was pending the Defendant, Union, failed to respond to the Plaintiff's written request for the status of his arbitration with regard to his grievance. (Exhibit A)

The Defendant, Sikorsky erroneously states that the Plaintiff's action accrued in March, 2002 when the Plaintiff went to the Defendant, Union's office to inquire about the status of his grievance and was allegedly told by the Union that it was not going to proceed to arbitration. (Defendant, Sikorsky, Memorandum of Law, pgs. 5, 13-14) Initially, it should be noted that the Defendant, Union never told the Plaintiff that his grievance was not proceeding to arbitration. (Exhibit A, Plaintiff's affidavit) The Defendant, Sikorsky's claim that

the Plaintiff was told in March, 2002 that his grievance was not proceeding to arbitration is also implausible considering the documents contained in the Union file for the Plaintiff's grievance and discharge. Notes in the Defendant, Union's file reflects that it needed more "info" for the Plaintiff's discharge and grievance. (Exhibit K) Notes in the file also reflect that the Defendant, Union contacted the plaintiff on March 15, 2002. (Exhibit K) The Defendant, Union's file also reflects that on March 19, 2002 the Defendant, Union wrote to the Defendant, Sikorsky requesting Plaintiff's complete medical file. (Exhibit J) On March 19, 2002 the Plaintiff also signed a medical authorization for the Defendant, Union. (Exhibit J, pg. 2) These documents clearly reflect that the Defendant, Union in March, 2002 was still pursuing the Plaintiff's grievance against the Defendant, Sikorsky. These documents also contradict the deposition testimony of the Union president, Harvey Jackson, in which he believes he told the Plaintiff in March. 2002 that the Union was not proceeding to arbitration. ( Exhibit F, Depo. of H. Jackson, pg. 47) Again the Defendant, Union, could not have told the Plaintiff that it was not proceeding any further with his grievance at that time when it is contacting the Plaintiff for more information and sending letters requesting the Plaintiff's medical file (which contained all the Plaintiff's drug test information) from the Defendant, Sikorsky. On and subsequent to March, 2002 the Defendant, Union, was still pursuing the Plaintiff's grievance to arbitration. Sufficient questions of material fact are in dispute concerning the accrual date of March, 2002 so as to preclude summary judgment. The court on summary judgment is not to decide questions of fact but to make a determination whether questions of fact exist.

21

The Defendant, Union, in its memorandum of law alleges that the Plaintiff's action should have accrued by July 18, 2001 which was one year after the third step of the grievance procedure. (Defendant, Union, Memorandum of law, pg. 18) This claim is obviously without merit as the Defendant, Union's, own documents indicates that it was continuing to work on the Plaintiff's grievance in March, 2002. It is important to note that the Collective Bargaining Agreement in the instant case contains no time limitation to proceed to arbitration after a claim for arbitration is made subsequent to the third step of the grievance process. (Exhibit D)

In the instant case at the Plaintiff's deposition on November 12, 2004 he was told by a Union representative for the first time that his grievance was not proceeding to arbitration. (The defendant, Union's, own file reflects that the Plaintiff's grievance was claimed for arbitration on July 18, 2000, Exhibit I attached hereto) At the Plaintiff's deposition he was asked by the Defendant, Union's, counsel whether he was told by the Defendant, Union, that they were not taking the grievance to arbitration. The Plaintiff denied that he was ever informed that the Union was not proceeding to arbitration. In response the Defendant's counsel informed the Defendant as follows;

Q: (Union's counsel) "—because you are not going to arbitration, okay. Let me make this perfectly clear now, you are not going to arbitration. Do you understand that?" (Exhibit L,Plaintiff's depo., pg. 53).

The Plaintiff in response stated that;

A: (The Plaintiff) "Yeah, now I do, yes you are telling me. I was not told that by anybody sitting at any desk anywhere, on the phone or anything. (Exhibit L, pg. 53)

This was the first representation made on behalf of the Defendant, Union, that they had decided to change their previous decision and not proceed to arbitration on the plaintiff's grievance.

Prior to the Plaintiff's deposition he was not told of the Union's intention to allegedly not to proceed to arbitration. In fact the Plaintiff was told the opposite, that his grievance was proceeding to arbitration and the Defendant's own documents confirm that his grievance was proceeding to arbitration.

The court in <u>Balsavage v. Ryder Truck Rental, Inc</u>. , 712 F. Supp. 461 (N.J. 1989) denied summary judgment in a similar case and held that the accrual date for a claim should arise after the Union in writing advises the employee that no further union proceedings are being pursued. Also supportive of the Plaintiff's action is <u>King v. New York Telephone, Co</u>., 785 F.2d 31 (2nd Cir. 1986), in which the court denied a Defendant's motion for summary judgment based on the six month statute of limitations in a hybrid Section 301/fair representation action. The Defendant, Union,  in <u>King</u> sought summary judgment alleging that the Plaintiff had thirty (30) days to seek arbitration after a denial in a four-step grievance process. The Union in <u>King</u> did not demand arbitration and therefore the Union claimed that the Plaintiff's action commenced more than six months after the denial of the last step of the grievance process was time barred. The court in denying the Defendant, Union's, summary judgment found that a question of fact

existed as to whether the Plaintiff was told whether her grievance was

proceeding to arbitration so as to prevent the accrual of her action. In <u>King</u> the

Plaintiff alleged as has been alleged in the instant case that the Union

represented it would "take the her case to arbitration". <u>King</u> at pg. 34-35 The

court stated in pertinent part:

> "King had no reason to believe that she had sufficiently exhausted her remedies under the collective bargaining agreement because the Union, which was serving as her representative in the grievance procedure, advised her that it would take the matter to arbitration. <u>Schum v. South Buffalo Railway</u>, 496 F.2d 328, 331-32 (2d Cir. 1974); cf. <u>Bowen v. United States Postal Service</u>, 459 U.S. 212, 225 & n. 14, 103 S.Ct. 588, 596 & n. 14, 74 L.Ed.2d 402 (1983) ("the union plays a pivotal role in the [grievance] process since it assumes the responsibility of determining whether to press an employee's claims" and usually holds the power to supervise the procedure). An employee's knowledge of the limitations period in a collective bargaining agreement is a question of fact as indicated in <u>Schum v. South Buffalo Railway</u>, 496 F.2d at 331 & n. 4: "Normally employees do not have the expertise, knowledge or experience to interpret the complicated substantive and procedural provisions incongruous if the Union's own dilatory conduct could provide it with a defense to his lawsuit, particularly in light of the special relationship between a union and its members. We therefore conclude that a material issue of fact exists as to whether the Union led King to believe that her claims had not yet accrued in August of 1983." Id. at pg. 34

There is an issue of material fact as to whether the Plaintiff should have

known prior to August, 2003 that the Defendant would not take further action to

proceed to arbitration on the Plaintiff's grievance. The communication between

the Plaintiff and defendant and Defendant's request for additional medical

documentation supports the Plaintiff's claim that he assumed the Defendant

would protect his grievance and arbitration rights. The Defendant's

correspondence dated March 19, 2002 to the Defendant, Sikorsky, suggests that

the Defendant did not consider the Plaintiff's case against his employer closed.

The Plaintiff continued to properly understand after the March 19, 2002

24

correspondence the Union sent to Sikorsky that his grievance and arbitration was being pursued.  Upon the Plaintiff's subsequent written inquiry concerning his grievance and arbitration in August, 2003 and the lack of response from the Union, the Plaintiff first became concerned about the status of his grievance and arbitration.

## III.  THE DEFENDANT IS EQUITABLY ESTOPPED FROM ALLEGING A STATUTE OF LIMITATION DEFENSE.

The Defendant, Union,, in the instant case should also be equitably estopped from interposing a statute of limitation defense.  A Defendant may be equitably estopped from asserting the statute of limitations" in cases where the Plaintiff knew of the existence of his cause of action but the Defendants conduct caused the Plaintiff a delay in bringing his lawsuit".  Cerbone vs. International Ladies Garmet Workers' Union, 768 F2d 45, 50 (2d Cir. 1985).  To invoke the equitable estoppel, a Plaintiff must show that: (1) the Defendant made a definite misrepresentation of fact, and had reason to believe that the Plaintiff would rely on it; and (2) the Plaintiff reasonably relied on that misrepresentation to his detriment.  See Heckler vs. Community Health Services, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223 81 L.Ed.2d 42 (1984).

The Defendants conduct in the instant case and it's communication with the Plaintiff reflect that the six-month time limitation period did not accrue until after August, 2003.  The Plaintiff is the instant case had no reason to believe that Defendant was not going to proceed with arbitration on the Plaintiff's behalf.  The Union plays a pivotal role in the grievance process since it assumes that

responsibility of determining whether to press and employee's claims and usually holds the power to supervise the process. Bowen vs. United States Postal Service, 459 US 212, 225, 103 SCt. 588, 596 (1983). The Plaintiff in the instant case reasonably believed that the Defendant was proceeding in good faith and relied on Defendant's representation after a series of communications about filing a grievance and arbitration. The Defendant, Union, informed the Plaintiff to be patient and wait, and that the Union had many other cases it was working on. The Defendant, Union, also informed the Plaintiff of other drug cases involving Oxycontin that it was working on resolving.

As stated above the court in King vs. New York Telephone Co., Inc., 785 F2d.31 (2d Cir. 1986), also reversed the trial courts granting of summary judgment on behalf of a union alleging the Plaintiff had not commenced an action alleging breach of the duty of fair representation within the applicable six-month limitations period. The court in King found that a factual question existed as to whether the Union led the Plaintiff to believe that her grievance would be filed. King at pg. 36. In King the Union failed to demand arbitration of the Plaintiff's grievance within a thirty-day contractual period. The court in overturning the trial court's granting of summary judgment found that the Union had represented to the Plaintiff that "it would take her case to arbitration". The court, first, held that summary judgment could not be granted since it could not be inferred that the Plaintiff was aware of a thirty-day period to request arbitration following denial of her step-four- grievance. King at pg. 34. And second, the court held that a fact-finder could conclude that it was reasonable for the Plaintiff to rely on the Unions

representation in a letter to the Plaintiff that "it would take her case to arbitration".
King at pg. 34-35  Similarly, the fact finder in the instant case could reasonably
conclude it was reasonable for the Plaintiff to rely on the Union's representation
that his case was proceeding to arbitration.

## CONCLUSION

For the foregoing reasons sufficient questions of material fact exist as to
whether the Defendant Sikorsky wrongfully discharged the Plaintiff without just
cause, whether the Defendant Union violated its duty of fair representation and
whether the accrual date of the Plaintiff's cause of action arose after August
2003.

The Plaintiff, Michael Verrilli

By_____
John T. Bochanis
DALY, WEIHING & BOCHANIS
1115 Main Street, Suite 710
Bridgeport, CT 06604
203-333-8500
Bar No. ct00138

Certificate of Service

I, John T. Bochanis, hereby certify that a copy of the foregoing Motion for

Extension of Time was served on all parties by mailing of copy thereof this 17th

day of May, 2005 to all counsel of record:

Edward J. Dempsey, Esq.
United Technologies Corporation
United Technologies Building
Hartford, CT 06101

John T. Fussell, Esq.
Robert M. Cheverie & Associates, P.C.
Commerce Center One
333 East River Drive, Suite 101
East Hartford, CT  06108

_____
John T. Bochanis