| | |
|---|---|
| **MICHAEL VERRILLI** | : |
| Plaintiff | : Civil Action No.:    **FILED** <br> : 3:03-CV-0541 (WWE) <br> : <br> : 2005 MAY 18   P 4: 57 |
| **SIKORSKY AIRCRAFT CORPORATION,** <br> **AND TEAMSTERS LOCAL 1150** | : US DISTRICT COURT <br> : BRIDGEPORT CT <br> : May 17, 2005 |
| Defendants | : |

### Plaintiff's Local Rule 56(a)(2) Responsive Statement and Disputed Issues of Material Fact

The Plaintiff pursuant to Rule 56(a)(2) of the Local Rules or Civil Procedure respectfully submits the following response to the Defendant, Teamsters Local 1150, Statement of Undisputed Facts[1]:

1) Admit the time period of employment but deny that the Plaintiff should have been drug tested or that he had a second positive drug test.
2) Admit
3) Admit
4) Admit
5) Admit
6) Admit except that Plaintiff denies that he did any work or was selected to perform work on any commercial helicopter parts and denies that he performed or was selected to perform any maintenance or overhaul and repair work on helicopters or helicopter parts.
7) Admit that the federal regulation exists. Deny the statement pertaining to the establishment of the regulation since there is no reference to support the claim as is required by the Federal Local Rule 56(a)(1).
8) Admit the federal regulation exists but deny that it applies to the Plaintiff in the instant case. (Exhibit A-1) (Exhibit A, para. 13, 14, 15).

---

[1] All exhibits referred to in this document are attached to the Plaintiff's memorandum of law except for Exhibit A-1, which is attached hereto

9) Admit the federal regulation exists but deny that it applies to the Plaintiff in the instant case. (Exhibit A-1) (Exhibit A, para. 13, 14, 15).

10) Admit the federal regulation exists but deny that it applies to the Plaintiff in the instant case. (Exhibit A-1) (Exhibit A, para. 13, 14, 15).

11) Admit the federal regulation exists but deny that it applies to the Plaintiff in the instant case. (Exhibit A-1) (Exhibit A, para. 13, 14, 15).

12) Admit the federal regulation exists but deny that it applies to the Plaintiff in the instant case. (Exhibit A-1) (Exhibit A, para. 13, 14, 15).

13) Admit the federal regulation exists but deny that it applies to the Plaintiff in the instant case. (Exhibit A-1) (Exhibit A, para. 13, 14, 15).

14) Admit the federal regulation exists but deny that it applies to the Plaintiff in the instant case. (Exhibit A-1) (Exhibit A, para. 13, 14, 15).

15) Admit

16) Admit

17) Deny that the drug testing described in letter 19 of the CBA applied to the plaintiff in the instant case. (Exhibit A-1) (Exhibit A, para. 13, 14, 15).

18) Admit

19) Denied. Employees are subject to drug testing only if they are "actually performing," "ready to perform" or "immediately available to perform" a "safety sensitive function" for an "employer" or "contractor company" as these terms are defined in 14 CFR, Part 121, App. 1. (Exhibit E) (Exhibit A-1).

20) Admit but deny that the Plaintiff worked on this helicopter. (Exhibit A, para. 13, 14, 15) (Exhibit A-1).

21) Admit but deny that the Plaintiff performed overhaul and repair maintenance work on such blades. (Exhibit A, para. 11, 12, 13, 14, 15).

22) Deny that the Plaintiff had to be placed in the "FAA pool" since he was not informed he would be "actually performing," "ready to perform" or "immediately available " to perform a "safety sensitive function" as defined in FAA drug testing regulations (Exhibit E, Exhibit A, para. 13, 14, 15) (Exhibit A-1).

23) Deny that the Plaintiff "actually performed" or was informed to be "ready to perform" or was told to be "immediately available to perform" work on 576 helicopters. (Exhibit A, para. 13, 14, 15) (Exhibit E) (Exhibit A-1).

24) Admit that the Plaintiff worked in the blade and composite department but deny that his work in the blade and composite department involved FAA covered work. (Exhibit A, para. 11, 12, 13, 14, 15).

25) Denied. The Plaintiff was not "scheduled" to perform FAA covered work. He was not informed that he would be "actually performing" such work and did not actually perform such work; he was not told that he should be "ready to perform" such work' and he was not told to be "immediately available to perform" such work. (Exhibit A, para 13, 14, 15) (Exhibit E) (Exhibit A).

26) Deny that the Plaintiff had to "become part of the pool" for FAA drug testing. The Plaintiff was not informed that he would be "actually performing" such work and did not actually perform such work; he was not told that he should be "ready to perform" such work' and he was not told to be "immediately available to perform" such work. (Exhibit A, para 13, 14, 15) (Exhibit E) (Exhibit A).

27) Admit that the work may be performed but deny that the Plaintiff was involved in any such S-76 work. (Exhibit A-1) (Exhibit A, para. 10, 11, 12).

28) Admit that the Plaintiff was put on a "list" but deny that he "fell under FAA guidelines." (Exhibit E) (Exhibit A, para. 13, 14, 15).

29) Admit that the Plaintiff attended an FAA drug testing orientation course but deny he should have been in a "FAA pool" and deny he should have been "drug tested." The Plaintiff was not informed that he would be "actually performing" FAA safety sensitive functions and did not actually perform such work; he was not told that he should be "ready to perform" such work' and he was not told to be "immediately available to perform" such work. (Exhibit A-1) (Exhibit A, para 13, 14, 15) (Exhibit E).

30) Admit that the Plaintiff attended an FAA drug testing orientation course but deny he should have been in a "FAA pool" and deny he should have been "drug tested." The Plaintiff was not informed that he would be "actually performing" FAA safety sensitive functions and did not actually perform such work; he was

not told that he should be "ready to perform" such work and he was not told to be "immediately available to perform" such work. (Exhibit A-1) (Exhibit A, para 13, 14, 15) (Exhibit E).

31) Deny that the Plaintiff should have been drug tested. Plaintiff was not "transferred into a covered job" since he was not "actually performing," he was told to be "ready to perform" such work and he was not told to be "immediately available to perform" such covered work. The Plaintiff never did commercial helicopter work. (Exhibit A-1) (Exhibit A, para. 10, 11, 12, 13, 14, 15) (Exhibit E).

32) Deny that all the blade department workers should have been in the FAA pool since not all of the workers in the blades shop were to be doing covered work. (Exhibit A, para 13, 14, 15) (Exhibit E).

33) Deny. The "likelihood of performing FAA work" does not require all of the employees in the blade and composite department to be drug tested. Only the employees who were to be "performing a safety sensitive function" as defined in the FAA regulations should have been tested. (Exhibit A, para. 13, 14, 15) (Exhibit E).

34) Deny. The "projected FAA work which was to be performed" did not require the Plaintiff to be drug tested. The Plaintiff was not told that he would be "performing a safety sensitive function" as it is defined in the FAA regulations and as a result he should not have been drug tested. (Exhibit A, para. 13, 14, 15) (Exhibit E).

35) Deny. The Plaintiff was informed that employees who were properly required to be drug tested pursuant to FAA regulations would be discharged if they had tested positive twice. (Exhibit A, para. 13, 14, 15) (Exhibit E).

36) Deny. The Plaintiff does not admit that he tested positive twice for drugs. A split sample specimen test was not performed on the Plaintiff's first drug test conducted in September, 1999. (Exhibit A, para. 20, 21, 22) (Exhibit G, pg. 577, (f)(1) required the Plaintiff to be notified that he had 72 hours to request a test of the split specimen).

37) Deny. The Plaintiff denies he tested positive for cannabis on September 9, 1999. A split sample specimen test was not performed on the Plaintiff's first drug

test conducted in September, 1999. (Exhibit A, para. 20, 21,22) (Exhibit G, pg. 577, (f)(1) required the Plaintiff to be notified that he had 72 hours to request a test of the split specimen).

38) Admit that a confirmation analyses was performed but deny that a split specimen test was performed. (Exhibit A, para. 20, 21, 22) (Exhibit B, no split sample test was performed).

39) Deny that the Plaintiff indicated he was a "regular user" of drugs. (Exhibit A-1).

40) Deny. The Plaintiff's drug test was not properly tested. The split urine specimen was not tested by another laboratory after the alleged positive test result was reported. The federal regulations require that the Defendant's Medical Review Officer "notify" the Plaintiff that he had 72 hours to request a test of the split urine specimen. (Exhibit G, 42 CFR Subtitle A, Section 40.33, (f)(I), pg. 577); Defendant's medical review officer admits in her affidavit that the split sample method of collection is used at the Defendant, Sikorsky. (Exhibit F, para. 7, attached to the Defendant's, Rule 56(a)(1) statement. (Exhibit A, para. 21, 22)). In addition, since the Plaintiff was not subject to FAA drug testing since he was not "actually performing" or told to be ready to perform safety sensitive work the drug test of September, 1999 violated state law. Connecticut General Statute Section 31-51u requires a second separate and independent drug test (using a different lab) to be conducted after an initial positive test.

41) Deny. The Plaintiff's grievance filed after his termination was based on the Defendant's Employer improperly and wrongfully requiring the Plaintiff to be drug tested, which would include the September, 1999 drug test. (Exhibit H) (Exhibit A-1)

42) Deny. The Plaintiff's grievance filed after his termination was based on the Defendant- Employer improperly and wrongfully requiring the Plaintiff to be drug tested which would include being placed in the "FAA pool". (Exhibit A-1) (Exhibit A, para. 10, 11, 12, 13) (Exhibit E).

43) Admit that the Plaintiff was required to be enrolled in a rehabilitation program. Deny that the Plaintiff should have been enrolled in a rehabilitation program since

he should not have been drug tested. (Exhibit A, para. 13, 14, 15) (Exhibit G) (Exhibit E).

44) Deny. The Plaintiff's grievance filed after his termination was based on the Defendant's Employer improperly and wrongfully requiring the Plaintiff to be drug tested, which would include the November, 1999 drug test. (Exhibit H) (Exhibit A-1)

45) Deny. The Plaintiff's grievance filed after his termination was based on the Defendant's Employer improperly and wrongfully requiring the Plaintiff to be drug tested, which would include the December, 1999, January 2000, February 2000 and all of the follow up drug tests. (Exhibit H) (Exhibit A-1)

46) Admit that the Plaintiff's test results were positive for cocaine, but deny the Plaintiff used the drug. (Exhibit A-1).

47) Admit.

48) Admit. But deny that the Plaintiff used the drug. (Exhibit A-1).

49) Deny. The Plaintiff's drug test was not properly tested. The split urine specimen was not tested by another laboratory after the alleged positive test result was reported. The federal regulations require that the Defendant's Medical Review Officer "notify" the Plaintiff that he had 72 hours to request a test of the split urine specimen. (Exhibit G, 42 CFR Subtitle A, Section 40.33, (f)(l), pg. 577); Defendant's medical review officer admits in her affidavit that the split sample method of collection is used at the Defendant, Sikorsky. (Exhibit F, para. 7, attached to the Defendant's, Rule 56(a)(1) statement (Exhibit A, para. 21, 22)). In addition, since the Plaintiff was not subject to FAA drug testing since he was not "actually performing" or told to be ready to perform safety sensitive work the drug test of September, 1999 violated state law. Connecticut General Statute Section 31-51u requires a second separate and independent drug test (using a different lab) to be conducted after an initial positive test.

50) Deny that the grievance was limited to the second positive drug test. The Plaintiff's grievance filed after his termination was based on the Defendant's Employer improperly and wrongfully requiring the Plaintiff to be drug tested, which would include all drug testing. (Exhibit H) (Exhibit A-1)

51) Admit.

52) Admit the existence of letter 19 but deny that letter 19 was applicable to the Plaintiff. (Exhibit A, para. 13, 14, 15).

53) Denied. The Plaintiff was improperly and without just cause discharged from employment based on the Defendant's improperly requiring the Plaintiff to be drug tested and for improperly conducting the drug test. This is different from individuals who were properly required to be tested and discharged for two properly conducted drug tests. (Exhibit A-1) (Exhibit A, para. 10, 11, 12, 13).

54) Admit.

55) Deny, the Plaintiff was never told that his case was not going to be arbitrated. (Exhibit A, para. 28, 29, 30, 31, 32, 33).

56) Denied. The Plaintiff was never told that his grievance did not merit arbitration. (Exhibit A, para. 28, 29, 30, 31, 32, 33).

57) Admit.

58) Admit.

59) Admit.

60) Admit

61) Admit.

**DISPUTED FACTS**

1) The Plaintiff did not do any work or was he selected to perform work on any commercial helicopter parts and denies that he performed or was selected to perform any maintenance or overhaul and repair work on helicopters or helicopter parts. (Exhibit A, para. 13, 14, 15).

2) Employees are subject to drug testing only if they are "actually performing," "ready to perform" or "immediately available to perform" a "safety sensitive function" for an "employer" or "contractor company" as these terms are defined in 14 CFR, Part 121, App. 1. (Exhibit E). And the Plaintiff was not told he was selected to perform a safety sensitive function as defined by Federal regulations (Exhibit E) (Exhibit A, para. 13, 14, 15).

3) The Plaintiff did not work on the S-76 helicopter. (Exhibit A, para. 13, 14, 15).

4) The Plaintiff did not perform overhaul and repair maintenance work on any blades. (Exhibit A, para. 13, 14, 15).

5) The Plaintiff should not have been placed in the "FAA pool" since he was not informed he would be "actually performing," "ready to perform" or "immediately available " to perform a "safety sensitive function" as defined in FAA drug testing regulations (Exhibit E, Exhibit A, para. 13, 14, 15).

6) The Plaintiff did not "actually perform" or was informed to be "ready to perform" or was told to be "immediately available to perform" work on S-76 helicopters. (Exhibit A, para. 13, 14, 15) (Exhibit E).

7) The Plaintiff's work in the blade and composites department didn't include FAA covered work. (Exhibit A, para. 13, 14, 15).

8) The Plaintiff was not "scheduled" to perform FAA covered work. He was not informed that he would be "actually performing" such work and did not actually perform such work; he was not told that he should be "ready to perform" such work' and he was not told to be "immediately available to perform" such work. (Exhibit A, para 13, 14, 15) (Exhibit E).

9) The Plaintiff should not have been requested to attend an FAA drug testing orientation course and he should not have been in a "FAA pool" and should not

have been "drug tested." The Plaintiff was not informed that he would be "actually performing" a FAA defined safety sensitive function and did not actually perform such work; he was not told that he should be "ready to perform" such work and he was not told to be "immediately available to perform" such work. (Exhibit A, para 13, 14, 15) (Exhibit E).

10) The Plaintiff was not "transferred into a FAA covered job" since he was not "actually performing," and he was not told to be "immediately available to perform" such FAA defined safety sensitive functions. The Plaintiff never did commercial helicopter work. (Exhibit A, para. 13, 14, 15) (Exhibit E).

11) All of the blade department workers should not have been in the "FAA pool" since not all of the workers in the blade and composite shop were to be doing FAA covered work. (Exhibit A, para 13, 14, 15) (Exhibit E).

12) The "likelihood of performing FAA work" does not require all of the employees in the blades department to be drug tested. Only the employees who were to be "performing a safety sensitive function" as defined in the FAA regulations should have been tested. (Exhibit A, para. 13, 14, 15) (Exhibit E).

13) The "projected FAA work which was to be performed" did not require the Plaintiff to be drug tested. The Plaintiff was not told that he would be "performing a safety sensitive function" as it is defined in the FAA regulations and as a result he should not have been drug tested. (Exhibit A, para. 13, 14, 15) (Exhibit E).

14) The Plaintiff was not tested positive twice for drugs. A split sample specimen test was not performed on the Plaintiff's first drug test conducted in September, 1999. (Exhibit A, para. 20, 21,22) (Exhibit G, pg. 577, (f)(1) required the Plaintiff to be notified that he had 72 hours to request a test of the split specimen).

15) The Plaintiff was not tested positive for cannabis on September 9, 1999. A split sample specimen test was not performed on the Plaintiff's first drug test conducted in September, 1999. (Exhibit A, para. 20, 21,22) (Exhibit G, pg. 577, (f)(1) required the Plaintiff to be notified that he had 72 hours to request a test of the split specimen).

16) A confirmation analyses of the urine specimen is not the same as a split specimen test conducted by a separate lab. (Exhibit A, para. 20, 21, 22).

17) The Plaintiff was not a "regular user" of drugs. (Exhibit A-1).
18) The Plaintiff's September, 1999 drug test was not properly tested. The split urine specimen was not tested by another laboratory after the alleged positive test result was reported. The federal regulations require that the Defendant's Medical Review Officer "notify" the Plaintiff that he had 72 hours to request a test of the split urine specimen. (Exhibit G, 42 CFR Subtitle A, Section 40.33, (f)(I), pg. 577); Defendant's medical review officer admits in her affidavit that the split sample method of collection is used at the Defendant, Sikorsky. (Exhibit F, para. 7, attached to the Defendant's, Rule 56(a)(1) statement (Exhibit A, para. 21, 22)). In addition, since the Plaintiff was not subject to FAA drug testing since he was not "performing a safety sensitive function" as defined by Federal regulations the drug test of September, 1999 also violated state law. Connecticut General Statute Section 31-51u requires a second separate and independent drug test (using a different lab) to be conducted after an initial positive test.
19) The Plaintiff's grievance filed after his termination was based on the Defendant's Employer improperly and wrongfully requiring the Plaintiff to be drug tested, which would include all drug testing of the Plaintiff, and for improperly performing the actual drug tests. (Exhibit H) (Exhibit A-1)
20) The Plaintiff's grievance filed after his termination was also based on the Defendant- Employer improperly and wrongfully requiring the Plaintiff to be included in the "FAA pool".
21) The Plaintiff should not have been enrolled in a rehabilitation program at work since he should not have been drug tested. (Exhibit A, para. 13, 14, 15) (Exhibit G).
22) The Plaintiff did not use cocaine and therefore disagrees with the March 2000 drug test results.
23) The Plaintiff's grievance filed after his termination was not limited to the second allegedly positive drug test but was based on the Defendant's Employer improperly and wrongfully requiring the Plaintiff to be drug tested, which would include all drug testing and was also based on the drug tests being improperly conducted. (Exhibit H) (Exhibit A-1)

24) The Plaintiff was improperly and without just cause discharged from employment based on the Defendant's improperly requiring the Plaintiff to be drug tested and for improperly conducting the drug test. This is different from individuals who were properly required to be tested and discharged for two properly conducted drug tests.

25) The Plaintiff was never told by the Defendant Union that his case was not going to be arbitrated. (Exhibit A, para. 28, 29, 30, 31, 32, 33).

26) The Plaintiff was never told by the Defendant Union that his grievance did not merit arbitration. (Exhibit A, para. 28, 29, 30, 31, 32, 33).

27) After the Plaintiff's grievance proceed through the first three steps of the grievance process the Plaintiff was informed by the Defendant, Union that his grievance was appealed to arbitration and that the Plaintiff's grievance would be put on the arbitration list with other grievance awaiting arbitration. (Exhibit A, para.28)

28) While the Plaintiff's grievance was awaiting arbitration he had several conversations with the Defendant, Union, concerning the status of his grievance and arbitration. He was continuously advised by the Defendant, Union that his grievance was being worked on and that it was claimed for arbitration and that he had to wait. (Exhibit A, para. 29)

29) On or about March , 2002 the Plaintiff met with the Union president, Harvey Jackson concerning the status of his grievance and arbitration. He was informed that the Union was working on his grievance and again he was told that it had been claimed to arbitration. (Exhibit A, para. 30)

30) In March, 2002 the Defendant, Union, had the Plaintiff sign a medical authorization to obtain his medial records from Sikorsky which would include all of his drug testing information, to assist the Union in working on his grievance. Subsequently, on March 19, 2002 the Defendant, Union, sent a letter to the Defendant, Sikorsky to obtain his medical file. (Exhibit A, para. 31)

31) The Plaintiff was never informed by the Defendant, Union, that they were not going to proceed to arbitration. The Defendant, Union, represented to the

Plaintiff that they were going to fight for him to get his job back. (Exhibit A, para. 32)

32) The Plaintiff was also informed by the Defendant, Union, in response to his inquiries concerning his grievance that there were lots of cases the Union was working on and that he was not the only person who had a grievance pending and that there was a lot of Union business going on. The Plaintiff was told by the Defendant, Union, to wait and be patient. (Exhibit A, para. 33)

33) In August, 2003 the Plaintiff wrote a letter to the Defendant, Union, asking for a response in writing concerning the status of his arbitration on his grievance. (Exhibit A, para. 34)

34) The Plaintiff did not receive a written response to his letter of August 2003 to the Defendant, Union, and despite attempts to follow-up with the Defendant, Union, to get a response he was not receiving any information as to the status of his grievance and arbitration, as a result the Plaintiff proceeded to file the instant action since he believed that his Union remedies had been exhausted due to the lack of response to his latest inquiries about the status of his grievance and arbitration. (Exhibit A, para. 35)

35) The first time the Plaintiff was actually told by any representative of the Defendant, Union, that this grievance was not proceeding to arbitration, was when the Defendant's Union, attorney informed him at his deposition on November 12, 2004 that his grievance was not proceeding to arbitration. (Exhibit A, para. 36)

36) During the time the Plaintiff's grievance was pending a large group of employees who worked for the Defendant, Sikorsky, were discharged for using, possessing and selling Oxycontin on company property. The Defendant's Union President, Harvey Jackson told the Plaintiff that the Union was handling those cases and to wait for those cases to come up so that the Union could attempt to resolve his grievance as part of those cases. The Defendant, Union, eventually proceeded to arbitration on the Oxycontin cases and many of the employees who were discharged were reinstate by the arbitrators decision. (Exhibit A, para. 37)

The Plaintiff, Michael Verrilli

By_____
John T. Bochanis
DALY, WEIHING & BOCHANIS
1115 Main Street, Suite 710
Bridgeport, CT 06604
203-333-8500
Bar No. ct00138

## Certificate of Service

I, John T. Bochanis, hereby certify that a copy of the foregoing was served on all parties by mailing of copy thereof this 17th day of May, 2005 to all counsel of record:

Edward J. Dempsey, Esq.
United Technologies Corporation
United Technologies Building
Hartford, CT 06101

John T. Fussell, Esq.
Robert M. Cheverie & Associates, P.C.
Commerce Center One
333 East River Drive, Suite 101
East Hartford, CT 06108

_____
John T. Bochanis

# EXHIBIT A-1

| | | |
|---|---|---|
| **MICHAEL VERRILLI** | : | |
| | : | **Civil Action No.:** |
| Plaintiff | : | **3:03-CV-0541 (WWE)** |
| | : | |
| | : | |
| | : | |
| **SIKORSKY AIRCRAFT CORPORATION,** | : | |
| **AND TEAMSTERS LOCAL 1150** | : | May 17, 2005 |
| | : | |
| Defendants | : | |
| | : | |

### SUPPLEMENTAL AFFIDAVIT OF MICHAEL VERRILLI

I, Michael Verrilli, hereby depose and state as follows:

1) I am over the age of 18 years old and agree in the obligation of an oath;
2) I am the Plaintiff in the above captioned matter;
3) I am familiar with the facts contained herein.
4) While employed for the Defendant's Sikorsky Aircraft Corporation I was never informed by my employer that I would be "actually performing", "ready to perform" or "immediately ready to perform" a "safety sensitive" function as defined in FAA drug testing regulations.
5) In September 1999, although the blade and composite department employees were informed that they would be placed in an FAA drug testing pool not all of the employees were to be performing a "safety sensitive" function pursuant to FAA regulations.
6) During my employment with the Defendant, Sikorsky, I did not perform any work on or for S-76 Helicopters.
7) I was never told by my employer, Sikorsky Aircraft, that they had reasonable suspicion that I was under the influence of drugs.
8) I never informed any employee or agent of the Defendant Sikorsky that I was a "regular user" of drugs.
9) I did not use cocaine during the period of my drug testing at Sikorsky Aircraft.

10) After I was discharged from my employment by the Defendant, Sikorsky, in March 2000 I filed a grievance due to my being discharged without just cause and for my employer Sikorsky Aircraft improperly requiring that I be drug tested which resulted in my termination and for the Defendant's improper drug testing procedures.

_____
Michael Verrilli

Subscribed and Sworn to before me the 16th day of May, 2005.

_____
Notary Public