United States District Court
District of Connecticut

Michael Verrilli,

*Plaintiff*

v.

Sikorsky Aircraft Corporation, &
Teamsters Local Union No. 1150

*Defendants.*

Civil Action No.

3:03 CV 0541 (WWE)

May 31, 2005

REPLY MEMORANDUM[1] IN SUPPORT OF
DEFENDANT SIKORSKY AIRCRAFT CORPORATION'S
MOTION FOR SUMMARY JUDGMENT

*Introduction*

Michael Verrilli's desperate search for a disputed material fact has given

this court a classroom exercise in hair splitting and dissembling.  However, the

facts that he admits and that are undeniable make summary judgment inevit-

able: Verrilli twice tested positive for drugs; the CBA mandates discharge for a

second positive drug test; and Verrilli never gave his union any reason to be-

lieve the drug test regime or results were improper.  The law does not require

---

[1] This memorandum is filed in reply to the memorandum in opposition filed by the
plaintiff. The plaintiff had been granted an extension of time to May 16, 2005 to file his
opposition. He failed to do so. His memorandum was filed on May 17th, unaccompanied
by the required Rule 56(a)(2) statement, which was filed a day later on May 18th. On May
20th the plaintiff filed a supplemental affidavit. The plaintiff's failure to file his opposition
in a timely manner is an additional reason to grant Sikorsky Aircraft's motion for sum-
mary judgment.

the Union, in order to satisfy its duty of fair representation, to engage in the

hair splitting analysis Verrilli now urges on this Court.

Michael Verrilli was in a department in which employees were available

to perform FAA sensitive work.  He twice tested positive for drugs pursuant to a

fairly administered process that followed all of the required protocols.  Even if

this Court were to consider on the merits the groundless arguments the plain-

tiff has put forward to try to wriggle out of his predicament, the law does not

require the Union to spend its resources pursuing such lame arguments.

***The Undisputed Facts***:

In his Rule 56(a)(2) statement, Verrilli has denied facts that he knows to

be true. For example, Sikorsky Aircraft asserts in paragraph 11 of its statement

of undisputed facts that:

> 11.    The remanufacture of blades for the S-76 began to be done
> by employees in the Blades Department during the last quarter of
> 1999. By the end of 1999 the Company had overhauled and
> repaired at least six blades. (Kollet@p. 17, 24)

Verrilli's reply to that assertion is:

> 11)    Deny that the Plaintiff actually performed or was told he
> should be ready to perform such work. (Exhibit A, para. 13, 14, 15)

That denial does not meet the substance of the asserted fact and should be

disregarded by the Court.

Similarly, in paragraph 18 of its statement of undisputed facts Sikorsky Aircraft asserts that

18.    Plaintiff Verrilli's September 9, 1999 drug test was positive for Cannabinoids (marijuana).

Verrilli's reply to that assertion is

18)    Denied. The split sample was never tested to verify the alleged initial positive test.

That denial is disingenuous. There is evidence that Verrilli's drug test was positive for marijuana and that the initial positive test, an immunoassy test, was confirmed by a second, independent test using gas chromatography/mass spectrometery. There is no evidence that Verrilli's drug test was not positive for marijuana. Therefore, it cannot be denied that his drug test was positive for marijuana. Whether or not another test, not required unless requested, could have been done or should have been done has no bearing on the truth of the matter asserted in paragraph 18.

These are only two examples of Verrilli's failure to respond in a straight-forward manner to either Sikorsky Aircraft's or Local 1150's statement of undisputed facts. Rather than proceeding in good faith to admit or deny the asserted facts, Verrilli takes every opportunity to assert, without any adequate support, two "facts" that are both untrue and irrelevant to the determination of this case: 1) that Verrilli was never "told" that he was available to do FAA-

3

covered work,[2] and 2) Verrilli was never "advised" that he could request a split sample test of his first positive drug test (Verrilli memo at p. 9). Essentially, these two points constitute the entire basis for Verrilli's opposition to summary judgment.[3] Each will be discussed in turn.

---

[2] Sikorsky Aircraft assumes that this is a major point for the plaintiff because Verrilli emphasizes in his denial of eight of Sikorsky Aircraft's asserted undisputed facts (#s 6, 8, 10, 11, 12, 13, 14, and 15) that he was never "told" he would be doing covered work. Curiously, however, he never makes this argument in his memorandum of law. In that memo (pages 8-9) he argues only that Verrilli never actually did covered work and further argues that it is unlikely he could not have been "ready" to do covered work. He never argues that Verrilli was not "told" he would be doing covered work, nor, more importantly, he never argues that Verrilli was not immediately available to do covered work. His failure to overcome the clear evidence that Verrilli was immediately available to do covered work is fatal to his opposition to summary judgment. Nevertheless, his emphasis in his affidavit and Rule 56(a)(2) statement on not being "told" he was available for covered work will be addressed.

[3] Verrilli argues in passing (Verrilli memo at pp 10-11) that the positive test results should be ignored because the drug testing protocol violated Conn. Gen. Stat. 31-51u. That statute requires that an initial positive test result be confirmed "by a second urinalysis drug test, which was separate and independent from the initial test, utilizing a gas chromatography and mass spectrometry methodology. . . ." That is exactly the protocol followed in this case. *See* Sikorsky Aircraft's answer to the plaintiff's interrogatory # 9:

> The drug test described in interrogatory #8 was performed by LabCorp, pursuant to the "Mandatory Guidelines for Federal Workplace Drug Testing Programs" of the Department of Health and Human Services (HHS). Following those guidelines, the laboratory performed an initial immunoassy test, the results of which were positive. Because of the positive initial test, again following the mandatory guidelines of HHS, the laboratory performed a second drug test, a confirmatory test, using gas chromatography/mass spectrometry. That test was also positive. Both of these tests were performed on September 11, 1999.

See also, affidavit of Dr. Maurer.

4

<u>Verrilli Was Properly in the FAA Drug Pool</u>

One of the fundamental facts on which this case is based is the fact that Verrilli was in the FAA drug testing pool, subject to the drug tests that eventually resulted in his discharge. Verrilli has been educated through this lawsuit to the fact that the FAA drug testing pool includes not only employees who actually perform covered work, but also employees who are "ready to perform or immediately available to perform" covered work. As much as he has tried to figure some way around that definition, it is undeniable that this definition included him.

Verrilli has denied or qualified his admission to some 18 paragraphs of Sikorsky Aircraft's Rule 56(a)(1) statement[4] on the basis of the same three paragraphs (13, 14 and 15) of his own self-serving affidavit. Therein he states:

> 13)    On or about September 1, 1999 while I was work at the Stratford Sikorsky manufacturing plant I was required to attend a meeting. I attended the meeting with other co-workers and employees of the Defendant, Sikorsky. I together with the other workers were informed that a new department was being set up for overhaul and repair work which was being moved from the Bridgeport plant to the Stratford plant and that the individuals who would be working on the overhaul and repair work would be subject to FAA drug testing.

> 14)    Approximately 40 employees who were involved in the assembly of blades were informed that a new area in the future was going to be created for the overhaul and repair work in Stratford.

---

[4] Paragraphs 6, 7, 10 through 16, 20 through 27 and 29.

> 15)    I was never informed by my employer that I was select-
> ed to perform or would actually be performing the FAA covered
> overhaul and repair work.

Obviously recognizing that these words did not track the regulatory definition,

Verrilli submitted a supplemental affidavit in which he averred:

> 4)    While employed for the Defendant's Sikorsky Aircraft
> Corporation I was never informed by my employer that I would be
> "actually performing," "ready to perform," or "immediately ready to
> perform" a "safety sensitive" function as defined in FAA drug
> testing regulations.[5]

The only way in which paragraph 15 of Verrilli's affidavit or paragraph 4 of his

supplemental affidavit can be considered true is in some sort of hair-splitting,

literal sense, *i.e.*, no one literally said to Verrilli, "You have been selected to

perform FAA covered overhaul and repair work," nor did anyone literally say to

Verrilli, "You would actually be performing the FAA covered overhaul and repair

work," or "You are to be immediately ready to perform a safety sensitive func-

tion." Rather, the undisputed facts, admitted by Verrilli,  are that Verrilli was

told that he would be in a group covered by the FAA drug testing regulations

and that was why he was tested for drugs.

The undisputed facts show that it was the selection to attend the Sep-

tember 1, 1999 FAA training session that was tantamount to selection to be

---

[5] As noted, supra, Verrilli does not argue in his memorandum of law that this
alleged "failure to inform" is of any consequence, and it is not.

available to do covered work.[6] Richard Kollet's testimony in that regard is undisputed, even considering the self-serving affidavit of Verrilli. Verrilli obviously knew why he had been sent to the meeting where he was informed about the FAA drug-testing program and he knew he had been selected as someone who could be available for covered work because, as he attests in paragraph 19 of his affidavit, "After the meeting of September 1, 1999 I was one of the initial employees of the blade shop to be drug tested."

---

[6] Verrilli's attorney took the deposition of Richard Kollet, Sikorsky Aircraft's manager in charge of the Blades department and inquired about the selection of employees for the FAA drug testing pool:

Q.    Who selected the individual employees to go into the FAA drug testing pool?

A.    I believe it was myself and my management team reviewed the work that the personnel in my department were doing at the time and determined that this work that we were going to undertake would likely go through the same hands, same people.

Q.    So you identified likely workers, then?

A.    Likely workers who generally worked on the newer version, the brand new S76 blade, or in areas where workers worked across product lines.                                    * * *

Q.    Now, with regard to these individual employees, then, you participated in a decision which employees would be identified to do this overhaul and repair work on the S76 blades, is that correct?

A.    Best I can recall, yes.

Q.    And was the – Were these employees then identified someway or, I should say, informed someway that they were going to be doing this work?

A.    I believe, in general, we informed the work force that we were going to undertake this work and then, by basis of their training through the FAA training that was provided by the company and the union representative, that was our way of informing these persons that they would be in the FAA drug test pool due to their actual or potential work on FAA covered work. (Kollet@16-17)

7

More importantly than whether or not anyone specifically *told* Verrilli that he had been selected for the FAA drug pool because he would be available to do covered work, is the fact, which Verrilli's artful affidavit does not deny, that Verrilli *was selected* for the FAA drug pool because he was to be available, and, on return from rehabilitation, *was available* to do covered work.

With that background, let's examine another of Verrilli's denials of Sikorsky's asserted undisputed facts, number 12, that reads:

> 12.     Working in the Blades Department, Plaintiff Verrilli would be doing the same type of work, whether he was working on production S-76 work (not FAA-covered) or the remanufacturing work (FAA-covered). Plaintiff Verrilli was in a job classification that allowed him to do the FAA covered work, whether or not he actually did so. (Kollet@p. 31).

In his Rule 56(a)(2) response to that assertion, Verrilli states:

> 12)     Denied. The Plaintiff never actually performed FAA covered work. The Plaintiff was never told he should be ready to perform such work. (Exhibit A, para 13, 14, 15).

That denial does not meet the substance of the asserted fact. Sikorsky asserts that Verrilli was in a job classification that allowed him to do FAA-covered work, whether he actually did so or not. For Verrilli to respond that he never actually did FAA work does not contradict the fact that he was in a job classification that allowed him to do so and therefore, he was in an FAA-covered job within the meaning of the applicable regulations. Then, for Verrilli to assert that he was never *told* he should be ready to perform such work does not

contradict the assertion that he was, in fact, in such a job, whether or not he was "told" so in any particular words.

Verrilli has no evidence that he was not in a job classification that allowed him to do FAA-covered work. The only evidence he provides on this subject at all is his own affidavits to the effect that he was not "told" that he was available for such work. In view of the fact that he admits attending the FAA drug program training session and admits that he was one of the first thereafter to be tested for drugs as part of the FAA program, the fact that now, six years after the fact, he states that he was not "told" in so many words that the FAA regulation applied to him does not create a disputed issue of fact.

<u>Verrilli Was Advised of His Right to Have a Split Specimen Test</u>

Virtually the only other contention put forward by Verrilli in his attempt to defeat summary judgment (Verrilli memo at p. 9) is his claim that the undeniable facts of his two positive drug tests must be ignored because, he claims, without any evidentiary support other than his self-serving affidavit, that he was not told he could request a split sample test of his first positive drug test. That statement does not square with the available evidence.  First, the brochure that was handed out to employees at the training session (as to which Verrilli testified "Maybe I had one." Verrilli@93) clearly states:

> If your test is positive, you have the right to request your split
> sample be tested. The request must be in writing within 72 hours

of being notified of a positive result. The Medical Review Officer will arrange for the split sample with another laboratory. The company will pay the split sample testing only if the results are negative.

This training session was held on September 1, 1999. Verrilli was then one of the first to be tested on September 9, 1999, therefore his memory concerning his rights to a split sample test would have been fresh in his mind. When his test was returned with a positive result, Dr. Maurer, the Medical Review Officer, advised Verrilli of his right to request a test of the split specimen, which he declined (Maurer Affidavit @ ¶ 7). The fact that Verrilli was advised of his right to a split sample test and declined to exercise that right is supported by the record of his interview with the MRO (Exhibit C to Maurer Affidavit). On the first page of that interview record the word "Yes" is circled next to the item that reads, "Review rights and procedures of retesting split sample (72 hour window)?"[7] On the second page of that record, the word "No" is circled next to the question, "Retesting of split sample requested (Donor)?" All of these records and the affidavit testimony of the MRO are consistent with the position taken by Verrilli that he did not and does not contest his initial positive drug test because he, in fact, was using marijuana. This conclusion, which is the reason why he did not request a split sample test (he knew it would be positive), is

_____

[7] This undisputed evidence contradicts the statement made by Verrilli on page 9 of his memorandum of law that, "none of the Defendant's drug testing documents reflect that the plaintiff was 'advised' that he had seventy-two (72) hours after the initial positive test to request a split sample test."

supported by his deposition testimony[8] and by his handwritten, signed state-ment submitted in support of his application for unemployment benefits (Union Exhibit 3).[9]

When Verrilli, in March 2000, tested positive a second time, he admits he was told about his right to request a test of the split sample, and he admits that he exercised that right. He makes no claim that this was the first time he had ever heard of this right. If it had been, he could have told the MRO that he was never advised of this right at the time of his initial positive test. The regu-

---

[8] Verrilli testified at his deposition as follows:

Q.    Do you have any recollection of being advised that you failed this initial drug test?
A.    Yes.
Q.    Who told you that?
A.    Medic.
Q.    Do you recall what person?
A.    No. I don't.
Q.    What is your best recollection of what they told you?
A.    That I had tested positive for marijuana.
Q.    Did you dispute that test?
A.    No.
                    * * *
Q.    After you had this meeting with medical, what were you told ... about your future employment at Sikorsky.
A.    That I would have to go into this – how do you say it – rehabilitation thing out of work while being paid until I cleaned up on the marijuana thing.
(Verrilli deposition at 20-21)

[9] In that statement he said:
Back in Setp (sic) 1999 we had to go to a meeting about FAA drug testing and then a class. Peopole (sic) were put in a pool because they were going to work on FAA O & R blades which is overhaul and repair. After that we were immediately being tested for drugs. I was one of the first ones and failed for pot. I went on a program and cleaned up my act within a month and was back to work.

lations provide, under those circumstances, the MRO would have the ability to then send the initial test split sample for an independent test, 49 CFR § 40.33(g).

When Verrilli testified at his deposition on November 12, 2004 that he did not dispute the test results from his first positive drug test, he was fully aware, at least by that time, that a split specimen test would have been available to him at his first test, because he asked for one at the time of his second positive. However, he did not qualify his testimony with any reference to having not been informed about the availability of a split specimen test. He simply said, he did not dispute the test results.  For Verrilli to now submit an affidavit saying he does dispute those test results because of the alleged failure to be advised of the split specimen test is an attempt to disavow his deposition testimony.   That attempt should be disregarded.[10]

*The Undisputed Facts Show the Union Did Not Act Arbitrarily*

In deciding whether to pursue Verrilli's grievance to arbitration, the Union considered the following undisputed facts: Verrilli twice tested positive for drugs in violation of the CBA. That drug testing took place pursuant to a

---

[10] *Mack v. United States*, 314 F.2d 120, 124-25  (2d Cir. 1987)::
It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.  *Miller v. International Telephone & Telegraph Corp., 755 F.2d 20, 24* (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S. Ct. 148, 88 L. Ed. 2d 122 (1985); Reisner v. General Motors Corp., 671 F.2d 91, 93 (2d Cir.), *cert. denied*, 459 U.S. 858, 74 L. Ed. 2d 112, 103 S. Ct. 130 (1982); Perma Research and Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969).

program that had been in place for many years at Sikorsky and was now being applied to a new group of employees because of a change in the work mix. Verrilli was not singled out by Sikorsky Aircraft for drug testing, nor were the protocols followed with regard to his drug tests different from those followed for everyone else subject to the program. On these facts, the Union made a reasonable decision that it would not succeed at arbitration and chose not to pursue Verrilli's grievance.

Verrilli now says there were problems with the drug testing that the Union should have exploited, *i.e.* the fact that Verrilli claims he was not advised he could request a split sample test on the first occasion and Verrilli was not "told" that he would be available for FAA-covered work. If provided with those arguments by Verrilli prior to making its decision regarding arbitration, the Union still would not have breached its duty of fair representation if it made a judgment that those arguments would be unavailing at arbitration. But, "a determination of whether a union breached its duty of fair represen- tation focuses on the factual and legal climate existing at the time the union acted." *White v. White Rose Food*, 237 F.3d 174, 180 (2d Cir. 2001). At the time the Union acted in this case, Verrilli had not brought either of these points to the attention of the Union, and they were not otherwise obvious. Verrilli never told the Union that he had not been informed of his right to request a split

sample test, but, had he done so, the Union, referring to the medical records that showed such advice was given, could reasonably conclude that Verrilli's testimony on a tangential issue would not allow him to prevail. Verrilli also never told the Union that he was not told he would be available to do covered work. Had he done so, the Union could reasonably conclude that, since Verrilli worked in the Blades department where the covered work was performed and had attended the FAA training class, his statement that he was not "told" he could be doing covered work would be not only irrelevant, but unbelievable.

### Conclusion

Verrilli has no evidence that Sikorsky Aircraft breached the CBA when it discharged him for two positive drug tests, properly administered pursuant to applicable federal regulations, nor has he any evidence that the Union acted arbitrarily when, after a review of the facts, declined to proceed to arbitration. Summary judgment is appropriate for both the Company and the Union.

Respectfully submitted,

_____/s/_____
Edward J. Dempsey
Labor Counsel
United Technologies Corporation
One Financial Plaza
Hartford, CT 06101
tel:    (860) 728-7858
efax:  (860) 660-0288
email: ed.dempsey@utc.com
Bar No. ct05183

<u>Certificate of Service</u>

I, Edward J. Dempsey, hereby certify that a copy of the foregoing Reply Memorandum in Support of Defendant Sikorsky Aircraft Corporation's Motion for Summary Judgment was served on all parties by mailing a copy thereof this 27th day of May 2005 to all counsel of record:

John T. Bochanis                    John T. Fussell
Daly, Weihing & Bochanis            Robert M. Cheverie & Associates, P.C.
Suite 710                           Commerce Center One
1115 Main Street                    333 East River Drive, Suite 101
Bridgeport, CT 06604                East Hartford, CT 06108



                    /s/
                Edward J. Dempsey