FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2005 JUN 13  A 9: 53

U.S. DISTRICT COURT
BRIDGEPORT, CONN.

| | |
|---|---|
| MICHAEL VERRILLI | ) |
| | ) |
| | ) |
| *Plaintiff* | ) Civil Action No. |
| | ) 3:03-CV-0541 (WWE) |
| vs. | ) |
| | ) |
| SIKORSKY AIRCRAFT CORPORATION | ) |
| *and* | ) |
| TEAMSTERS LOCAL UNION NO. 1150 | ) June 13, 2005 |
| | ) |
| *Defendants* | ) |
| | ) |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT TEAMSTERS LOCAL UNION NO. 1150's MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael Verrilli's Local Rule 56(a)(2) Responsive Statement and Disputed

Issues of Material Fact dated May 17, 2005 has failed to place material facts in dispute sufficient

to survive summary judgment.[1]

### I.    Plaintiff's Reply contradicts his deposition testimony and must be disregarded.

It is well settled in this circuit that a party's affidavit which contradicts his own prior

deposition testimony should be disregarded on a motion for summary judgment. *Mack v. United

States*, 814 F.2d 120, 124-25 (2d Cir. 1987), citing *Miller v. Intnl. Tele. & Teleg. Corp.* 755 F.2d

20, 24 (2d Cir.), cert denied, 474 U.S. 851, 106 S.Ct. 148 (1985).  As stated by the Second

Circuit Court in *Perma Research*: "If a party who has been examined at length on deposition

could raise an issue of fact simply by submitting an affidavit contradicting his own prior

testimony, this would greatly diminish the utility of summary judgment as a procedure for

---

[1]    Plaintiff's Responsive Statement and Disputed Issues of Material Fact dated May 17, 2005, and
his Affidavit in support thereof, will hereinafter be referred to as "Plaintiff's Reply".

screening out sham issues of fact." *Mack,* at 124-25, citing, *Perma Research and Development Co., v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969).

> **A.     Plaintiff Verrilli's "Sham Issues of Fact" Do Not Shield him from the Undisputable Fact that as a Blade Department Employee he was Subject to FAA Drug Testing Whether or Not he Actually Worked on an FAA Covered Part.**

Plaintiff Verrilli's Reply Affidavit dated May 17, 2005 feigns a disputed issue of material fact by stating at paragraph 4:

> *While employed for the Defendant's Sikorsky Aircraft Corporation I was never informed by my employer that I would be "actually performing", "ready to perform" or "immediately ready to perform" a "safety sensitive" function as defined in FAA drug testing regulations.*

Plaintiff's assertion is contrary to his prior deposition testimony. Specifically, he acknowledged that he was on the list of employees to perform FAA work. He further testified that he participated in orientation regarding the required FAA drug testing. Finally, he conceded that he and all other Blade Department employees were required to undergo drug testing whether or not they actually worked on an FAA covered part. In this regard, his deposition of November 14, 2004 reads as follows:

> A:     Okay, yes, there was a meeting about a new department being set up in the Stratford plant coming from Bridgeport where O&R was always based. They were going to move all this overhaul and repair work for a team of people picked, a team of people to work on.
>
> Q:     Okay. Were you a part of that team?
>
> A:     My name was on the list, yes.
>
> Q:     That O&R work, is it your understanding that that was FAA work?
>
> A:     Right, that it fell under FAA guidelines, right.
>
> Q:     What was your understanding of the guidelines for FAA work concerning drug testing?
>
> . . .
>
>         Yes. Sir, if you don't understand my question, you can ask me, okay?
>
> A:     No, that whoever would be working on any of this overhaul and repair work would be subject - - would have to take drug tests, no ifs, ands or buts, that's what you had to do.
>
> Q:     How did you come to that understanding?

**ROBERT M. CHEVERIE & ASSOCIATES, P.C.**

COMMERCE CENTER ONE • 333 EAST RIVER DRIVE • SUITE 101 • EAST HARTFORD, CT 06108 • (860) 290-9610 • FAX (860) 290-9611 • JURIS NO. 405719

A:     They had an orientation, a little meeting with, I believe it was Harry Tistonza who runs, I believe he's in charge of alcohol abuse and drug, if there's any problems in the company, personal problems, he's that kind of person; and somebody from the union was also there, a woman, I can't recall her name.

. . . .

Q:     Now aside from this orientation meeting or training meeting, however you want to characterize it concerning the O&R work, were you aware that Sikorsky had guidelines for implementing drug testing on certain work, for certain work?

A:     Right, just on O&R work that I knew or any commercial aircraft which wasn't government contracted.

Q:     Were you aware that the union had a letter in the collective bargaining agreement that addressed this?

A:     Right, 105, 106 page. . . .

A:     Yes, that's the collective agreement, bargaining, whatever, union.  Union book.

(Verrilli Deposition 11/12/04, pp. 7-10).[2]

Plaintiff is unable to avoid the threshold acknowledgment that throughout 1999 and until

he was terminated in March 2000, he was part of the Department that performed FAA covered

work.  Thus, the Blade Department as a whole (including Plaintiff Verrilli) was legitimately

subject to FAA drug testing and was tested regardless of whether or not they actually performed

the specific FAA covered work.[3]  The point of the FAA's broad definition of "performing a

---

[2]     Copies of all relevant pages of Plaintiff Verrilli's Deposition are attached hereto as Exhibit 1.

[3]     The FAA Drug Testing Regulations define *"performing a safety-sensitive function"* as follows:
          An employee is considered to be performing a safety-sensitive function during any period in which he or she is actually performing, ready to perform, or immediately available to perform such function.
     (FAA, DOT, 14 CFR Part 121, Appendix I, p. 567 (1999 edition)).

     The FAA Drug Testing Regulations require *"Pre-employment Testing"* as follows:
          "Prior to the first time an individual performs a safety-sensitive function for an employer, the employer shall require the individual to undergo testing for prohibited drug use."
     (FAA, DOT, 14 CFR Part 121, Appendix I, Section V. A. 1, p. 568 (1999 edition)).

     The FAA Drug Testing Regulations provide that:
          "No employer shall allow an individual required to undergo pre-employment testing under section V, paragraphs A.1 or A.2 of this appendix to perform a safety-sensitive function unless the employer has received a verified negative drug test result for the individual."
     (FAA, DOT, 14 CFR Part 121, Appendix I, Section V. A. 3, p. 568 (1999 edition)).

     The FAA Drug Testing Regulations require *"Return to Duty Testing"* as follows:

3

safety sensitive function" (see footnote 2) is to drug test employees *before* they actually perform covered work. As such, the FAA Regulations apply to employees who are available to perform FAA covered work and who may perform FAA covered work – not simply those (as Verrilli baldly urges) who perform FAA work.

Plaintiff Verrilli, like the others in the Blade Department, was subject to FAA drug testing Regulations. Plaintiff Verrilli tested positive for unlawful drugs proscribed by FAA Regulations on two separate occasions. He was terminated from his employment with just cause as a result of his second positive drug test. There is no merit to Plaintiff's hybrid/DFR action. Defendants are entitled to summary judgment.

### B.    Plaintiff Verrilli Twice Failed FAA Drug Tests

Contrary to his deposition testimony, Plaintiff now asserts at paragraph 14 of his Reply that: "The Plaintiff was not tested positive twice for drugs." Specifically, in his deposition he testified as follows:.

Q:    You were advised you were going to be doing FAA work, correct?
A:    Right, at one point.
Q:    And you were given a test pursuant to the fact that you were scheduled along with a pool of other people to do FAA work, correct?
A:    Right.
Q:    And you were tested pursuant to that policy, correct?
A:    Right.
Q:    And you failed that?
A:    Right.
Q:    And you failed a second?
A:    Right.
Q:    What progressive discipline do you believe you were entitled to?

"Each employer shall ensure that before an individual is returned to duty to perform a safety-sensitive function after refusing to submit to a drug test required by this appendix or receiving a verified positive drug test result on a test conducted under this appendix the individual shall undergo a drug test. No employer shall allow an individual required to undergo return to duty testing to perform a safety-sensitive function unless the employer has received a verified negative drug test result for the individual."
(FAA, DOT, 14 CFR Part 121, Appendix I, Section V. F., p. 570 (1999 edition)).

**ROBERT M. CHEVERIE & ASSOCIATES, P.C.**
COMMERCE CENTER ONE • 333 EAST RIVER DRIVE • SUITE 101 • EAST HARTFORD, CT 06108 • (860) 290-9610 • FAX (860) 290-9611 • JURIS NO. 405719

A:    Being rehabilitated for whatever the second time, I wasn't, when they did the first time. They just walked me out the door like I was a total stranger who didn't belong there.

Q:    So was it your testimony that the second time when you got a positive for cocaine you should have been rehabilitated for cocaine; is that your understanding, is that what you thought?

A:    That's - -

Q:    Suppose a third time you were taken and it was heroin, should you be given another time to clean up for heroin?

A:    I would imagine each drug is a different way to take care, you know, to help somebody with, like I explained to you before.

Q:    And so if you get addicted to Oxycontin, would you be given another test, another chance to rehab; is that your understanding?

A:    Well, that's basically the same as heroin, it's an opiate, it falls under the, it would be the same thing. . . . .

Q:    Did you file a grievance because you weren't given that 30-day grace period?

A:    No, I was already caught and positive, I went through the program.

(Verrilli Deposition 11/12/04, pp. 82-84).

In contrast to the above deposition testimony acknowledging that he was "*caught and positive,*" Plaintiff's Reply remarkably states: "The Plaintiff denies he tested positive for cannabis on September 9, 1999." (Plaintiff's Reply, 05/17/05, ¶ 37). Plaintiff cannot simply create material factual disputes by assertions contradicted by his own prior deposition admissions. *Mack v. United States,* 814 F.2d 120, 124-25 (2d Cir. 1987). Assertions in Plaintiff's Reply inconsistent with his prior deposition testimony must be disregarded. Defendants are entitled to summary judgment.

### C.    Plaintiff Verrilli Did Not Previously Dispute the Validity of the Positive FAA Drug Tests for which he was Terminated.

During Plaintiff Verrilli's deposition he was specifically asked whether he had any reason to doubt the representation that his first failed drug test had been confirmed by an analysis using gas chromatography. He answered: "No, not to my knowledge, if that's what they say, that's how they did it" (Verrilli Deposition, 11/12/04, p. 20). When asked if he disputed the results of that test, he answered, "No." (*Id.* p. 21). He admitted that he did not file any grievance

concerning that drug test or any grievance concerning being placed in the pool of employees to be drug tested. (*Id.*).

As a result of his positive FAA drug test in September 1999, Plaintiff Verrilli was informed that he would be randomly tested once a month for sixty (60) months and that if he tested positive a second time, he would be terminated (Verrilli Deposition, pp. 21-23). Plaintiff Verrilli submitted to FAA follow-up drug tests in November 1999, December 1999, January 2000 and February 2000 and did not file any grievance contesting Sikorsky Aircraft's right to conduct those FAA mandated follow-up drug tests (Verrilli Deposition, pp. 25-26).

On March 21, 2000, Plaintiff Verrilli tested positive for cocaine (Verrilli Deposition, p. 27). On March 21, 2000, Plaintiff Verrilli requested a "split sample" test in connection with his positive cocaine drug test (Verrilli Deposition, p. 28). He acknowledged that the split sample was confirmed (Id., pp. 28-29). Plaintiff Verrilli admitted in his Deposition testimony that he has no evidence that any of the drug tests to which he submitted were performed contrary to proper testing standards (Verrilli Deposition, p. 77).

Contrary to his deposition testimony, in his Reply at paragraph 38 Plaintiff now asserts "that a confirmation analyses was performed but deny that a split specimen test was performed." Similarly, in contrast to his deposition testimony, his Reply baldly asserts at paragraphs 40 and 49: "The Plaintiff's drug test was not properly tested."

Plaintiff's Reply denials contradict his deposition testimony given six months earlier and must be disregarded. *Mack*, at 124-25, citing, *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). There is no dispute of *material* facts. Consistent with the terms of the governing collective bargaining agreement and pursuant to FAA Regulations,

**ROBERT M. CHEVERIE & ASSOCIATES, P.C.**

COMMERCE CENTER ONE • 333 EAST RIVER DRIVE • SUITE 101 • EAST HARTFORD, CT 06108 • (860) 290-9610 • FAX (860) 290-9611 • JURIS NO. 405719

Plaintiff tested positive for illegal drugs twice, and his employment was terminated. There is no merit to his untimely hybrid/DFR action.

### D.     Plaintiff Verrilli is subject to the terms of the Collective Bargaining Agreement.

Plaintiff's Reply dated May 17, 2005 at paragraph 18 admits, consistent with the allegations within his Complaint dated December 29, 2003, that his terms and conditions of employment were governed by the Collective Bargaining Agreement between Sikorsky and the Union (Plaintiff's Reply, 05/17/05 ¶ 18). Remarkably however, Plaintiff Verrilli now argues that sections of the Collective Bargaining Agreement are not applicable. Specifically, while he admits the existence of Letter 19 (the negotiated drug policy that explicitly provides termination of employment upon a second positive drug test), Plaintiff's Reply curiously states: "but deny that letter 19 was applicable to the Plaintiff" (Plaintiff's Reply, 05/17/05, ¶ 52).

Plaintiff Verrilli apparently believes that he is likewise immune from the time limits set forth in the grievance procedure within the CBA. The collective bargaining agreement explicitly provides that, "A grievance must be filed within five (5) working days immediately following the date of the condition or event which gives rise to the grievance or within the five (5) working day period immediately following the date on which the employees should reasonably have become aware of the condition or event from which the grievance arises (CBA, Article VI, §6.2).[4] The CBA provides that these procedures "must be adhered to." (*Id.* §6.1). Thus, Plaintiff's assertion in his Reply that his termination grievance dated April 3, 2000 contested *all* of his drug tests including the September, November and December 1999 drug tests and the

---

[4]     The relevant portions of Article VI of the CBA are attached hereto as Exhibit 2.

**ROBERT M. CHEVERIE & ASSOCIATES, P.C.**

COMMERCE CENTER ONE • 333 EAST RIVER DRIVE • SUITE 101 • EAST HARTFORD, CT 06108 • (860) 290-9610 • FAX (860) 290-9611 • JURIS NO. 405719

January and February 2000 drug tests ignores the CBA's language that bars such dated claims (Plaintiff's Reply, 05/17/05 ¶¶'s 41, 42, 43, 44, 45 50, 53).

Plaintiff Verrilli cannot escape his prior admissions, actions, and inactions. His hybrid-DFR lawsuit lacks any merit and, in addition, is time-barred by the applicable six-month statute of limitations as formerly argued in Defendant's Memorandum of Law in Support of Summary Judgment. Judgment must enter for Defendants.

## II.    Conclusion

To establish a hybrid-DFR claim, Plaintiff must prove that the Employer breached the collective bargaining agreement *and* that the Union breached its duty of fair representation. *White v. White Rose Food,* 237 F.3d 174, 178-179 (2001). Plaintiff's Reply does not save his Complaint from summary judgment. The plain unambiguous language of the CBA provides that an employee is terminated upon a second positive drug test. Plaintiff's deposition testimony acknowledges that he twice tested positive pursuant to an FAA drug test administered in September 1999 and March 2000. Accordingly, his termination did not breach the collective bargaining agreement, and Defendants are entitled to summary judgment.

In addition, the law recognizes that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 67 111 S.Ct. 1127 (1991) quoting, *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 73 S.Ct. 681 (1953). As noted by this Court in the *Balestracci* Decision, this 'wide range of reasonableness' gives the union the room to make discretionary decisions and choices even if those judgments are ultimately wrong. *Balestracci v General Dynamics Corp.,* 221

**ROBERT M. CHEVERIE & ASSOCIATES, P.C.**
COMMERCE CENTER ONE • 333 EAST RIVER DRIVE • SUITE 101 • EAST HARTFORD, CT 06108 • (860) 290-9610 • FAX (860) 290-9611 • JURIS NO. 405719

F.Supp.2d 258, 266 (D.Conn. 2002), citing, *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 45-46, 119 S.Ct. 292 (1988) quoting *Air Line Pilots,* 499 U.S. at 78, 111 S.Ct. 1127.

The Cederbaum Slate filed Plaintiff Verrilli's denied third step grievance for arbitration in July 2000 and then took no further action. The Rocco Calo Slate assumed office in January 2002, and reviewed all pending grievances. Based upon the factual and legal landscape, the futility of proceeding to arbitration with Mr. Verrilli's case was readily apparent. Specifically, Mr. Verrilli had tested positive for illegal drugs in 1999 and 2000 pursuant to applicable FAA drug testing Regulations. As in his deposition testimony, Mr. Verrilli offered the Union no reason to question the validity of the tests. Moreover, he knows of no instance where the Union has arbitrated the grievance of an employee who tested positive for drugs twice. Mr. Verrilli was therefore properly terminated under the terms of the parties' CBA.

Pursuant to the above-quoted decision of this Court and the U.S. Supreme Court, the DFR query is not whether in deciding to proceed to arbitration with Mr. Verrilli's case the Union was right or wrong. The issue is whether the Union's decision was within the 'wide range of reasonableness.' *Balestracci* at 266. Plaintiff Verrilli's deposition testimony on November 12, 2004 provides the undisputable answer to that query. Specifically, based upon his two uncontested positive FAA drug tests and the language of Letter 19 of the CBA, the Union's decision to decline arbitration was reasonable. Accordingly, Plaintiff cannot demonstrate that the Union breached its duty of fair representation.

Plaintiff's belated contradictory assertions in his Reply do not alter the essential material facts that support summary judgment in favor of Defendants.

**ROBERT M. CHEVERIE & ASSOCIATES, P.C.**
COMMERCE CENTER ONE • 333 EAST RIVER DRIVE • SUITE 101 • EAST HARTFORD, CT 06108 • (860) 290-9610 • FAX (860) 290-9611 • JURIS NO. 405719

Respectfully submitted,
DEFENDANT
TEAMSTERS LOCAL NO. 1150

By:    _____
John T. Fussell, Esq.
Fed. Bar # ct 17989
ROBERT M. CHEVERIE &
  ASSOCIATES, P.C.
Commerce Center One
333 East River Drive, Suite 101
East Hartford, CT  06108-4206
E-mail:  jfussell@cheverielaw.com

# **C E R T I F I C A T I O N**

This is to certify that a copy of the *Reply Memorandum In Support of Defendant*

*Teamsters Local Union No. 1150's Motion for Summary Judgment* was mailed this 13th

day of June, 2005, to the following:

*Counsel for Plaintiff:*

John T. Bochanis
DALY, WEIHING & BOCHANIS
1115 Main Street, Suite 710
Bridgeport, CT 06604

*Counsel for Defendant*
*Sikorsky Aircraft Corporation:*

Edward J. Dempsey
Labor Counsel
United Technologies Corporation
United Technologies Building
One Financial Plaza
Hartford, CT  06101

_____
JOHN T. FUSSELL

JTF.TMST1150.M.Verrilli
Reply Memorandum In Support of Defendant 1150's MOTION FOR SUMMARY JUDGMENT 06-13-05

**ROBERT M. CHEVERIE & ASSOCIATES, P.C.**

COMMERCE CENTER ONE • 333 EAST RIVER DRIVE • SUITE 101 • EAST HARTFORD, CT  06108 • (860) 290-9610 • FAX (860) 290-9611 • JURIS NO. 405719

1    were you aware that your department was scheduled to do some

2    O&R work?

3        A    Yes.

4                        MR. BOCHANIS:  Well, I will object to

5                    the question.

6                        MR. CHEVERIE:  You can answer it.

7                        THE WITNESS:  I can answer it?

8                        MR. CHEVERIE:  Yes.

9                        THE WITNESS:  Okay, yes, there was a

10                   meeting about a new department being set up in

11                   the Stratford plant coming from Bridgeport

12                   where O&R was always based.  They were going

13                   to move over all this overhaul and repair work

14                   for a team of people picked, a team of people

15                   to work on.

16   BY MR. CHEVERIE:

17        Q    Okay.  Were you a part of that team?

18        A    My name was on the list, yes.

19        Q    That O&R work, is it your understanding that that

20   was FAA work?

21        A    Right, that it fell under FAA guidelines, right.

22        Q    What was your understanding of the guidelines for

23   FAA work concerning drug testing?

24                        MR. BOCHANIS:  I will object to the

25                   question.

```
 1                    MR. CHEVERIE:  You can answer.
 2                    MR. BOCHANIS:  Let me get this straight,
 3            you are asking him about the regulation --
 4                    MR. CHEVERIE:  His understanding.
 5                    MR. BOCHANIS:  -- set forth through
 6            Sikorsky; is that what you are asking?
 7                    MR. CHEVERIE:  Yes.  Sir, if you don't
 8            understand my question, you can ask me, okay?
 9                    THE WITNESS:  No, that whoever would be
10            working on any of this overhaul and repair
11            work would be subject -- would have to take
12            drug tests, no ifs, ands or buts, that's what
13            you had to do.
14   BY MR. CHEVERIE:
15       Q    How did you come to that understanding?
16       A    They had an orientation, a little meeting with, I
17   believe it was Harry Tistonza who runs, I believe he's in
18   charge of alcohol abuse and drug, if there's any problems in
19   the company, personal problems, he's that kind of a person;
20   and somebody from the union was also there, a woman, I can't
21   recall her name.
22       Q    So this person made a presentation concerning the
23   applicability of drug testing to this O&R work; is that a
24   fair statement?
25       A    Yeah, that that would be part of it, you know,
```

1    when the whole thing got put together, this whole plan of

2    the O&R.

3        Q    Okay.  And approximately how many people attended

4    this presentation?

5        A    I believe it was about 40 people.

6        Q    In addition to that presentation, were you given

7    any other work -- I am sorry, any other training concerning

8    this O&R work that was going to come?

9        A    No, no, it was just all talked about in the future

10   that it was coming, that this department was going to be set

11   up, a whole new area was going to be resurrected for this

12   particular work.  A new department was going to be built, an

13   area.

14       Q    What is your understanding of how many people from

15   your area were going to be part of this new department or

16   doing this new work?

17       A    Maybe, maybe five people on my shift because of

18   the fact that night shift, there's a small crew on nights.

19       Q    Do you have any idea how many people in the day

20   shift were also impacted by this?

21       A    It was, like I said, a total of about 40 people

22   throughout, from one end of the company to the other which

23   were different departments which all fell under the same,

24   the assembly of blades, who knew, who knew how to do the

25   work.

1     Q    Now aside from this orientation meeting or

2    training meeting, however you want to characterize it

3    concerning the O&R work, were you aware that Sikorsky had

4    guidelines for implementing drug testing on certain work,

5    for certain work?

6     A    Right, just on O&R work that I knew or any

7    commercial aircraft which wasn't government contracted.

8     Q    Were you aware that the union had a letter in the

9    collective bargaining agreement that addressed this?

10    A    Right, 105, 106 page.

11    Q    106, 107 in this --

12    A    Okay.

13    Q    -- but very close.

14         I'm going to introduce or have marked as an

15    exhibit this Letter 19 which is, I'm going to show you the

16    contract and ask you, can you identify that?

17    A    Yes, that's the collective agreement, bargaining,

18    whatever, union.  Union book.

19    Q    Is that the collective bargaining agreement that

20    was in effect at the time that you were discharged from

21    employment at Sikorsky?

22    A    Yes.

23    Q    I want to take a moment to direct your attention

24    to pages 106 and 107 and ask you if you can take a moment,

25    look at that and tell me if you can identify it.

1    A    "Confirmation analyzes or performed using Gas

2    Chroma" -- how do you say that, chroma --

3    Q    Chromatography?

4    A    -- "Chromatography."

5    Q    I am no better than you, sir.

6    A    -- "Mass Spectra -- Spectrometry for all drugs

7    except Ethanol".

8    Q    Right, and, sir, as you sit here today, do you

9    have any reason to doubt that representation?

10    A    To doubt what, that that's the way that they

11    tested?

12    Q    Yes.

13    A    No, not to my knowledge, if that's what they say,

14    that's how they did it.

15    Q    Now when were you advised of the results of that

16    test?

17    A    I actually couldn't tell you when I was advised to

18    when the results of that test were turned back to the

19    company.

20    Q    Would it be fair to say at some point during the

21    month of September -- does that sound right to you?

22    A    It's possible, yeah, probably.

23    Q    Do you have any recollection of being advised that

24    you failed this initial drug test?

25    A    Yes.

1    Q    Who told you that?

2    A    Medic.

3    Q    Do you recall what person?

4    A    No, I don't.

5    Q    What is your best recollection of what they told

6  you?

7    A    That I had tested positive for marijuana.

8    Q    Did you dispute that test?

9    A    No.

10   Q    Did you file a grievance concerning that test?

11   A    Concerning that test, no.

12   Q    Did you file any grievance concerning being placed

13 in the O&R pool to do O&R work?

14   A    No, I didn't.

15   Q    After you had this meeting with medical, what were

16  you told or during this meeting with medical what were you

17  told about your future employment at Sikorsky?

18   A    That I would have to go into this -- how do you

19  say it -- rehabilitation thing out of work while being paid

20  until I cleaned up on the marijuana thing.  When that came

21  clean and they thought this particular place they sent me to

22  thought that I was good and that I wasn't using marijuana

23  anymore and that I had to test again before I went back to

24  work to make sure I was clean, that I could continue to work

25  and that I would be tested randomly once a month for I

1    believe it was 60 months, which is five years.

2        Q    What, if anything, were you told about the

3    consequences if, during that 60-month period, you had

4    another positive?

5        A    That I could be terminated.

6        Q    Do you recall who made that statement to you?

7        A    I don't recall who.  It might have been in the

8    orientation, I believe it was told to everybody who was

9    there.

10        Q    Was it also told to you immediately prior to you

11    returning to work after rehab, when you were told about the

12    60 months and that if you had a second positive, what the

13    consequences would be?

14        A    No, it was just told the first time and then when

15    I was done with the rehab, I just returned to work and

16    things just went on regular; as nobody had come and

17    addressed me, I just returned back to work, reported to my

18    department and started to work.  Nobody changed my job scope

19    or I wasn't taken down to anywheres and talked to by

20    anybody.

21                    MR. CHEVERIE:  Just give me a minute

22            here.

23                    THE WITNESS:  Sure.

24

25                    (Pause.)

1    BY MR. CHEVERIE:

2        Q    I want to ask you to go back and look at

3    Defendant's No. 2.

4        A    Page 2 or --

5        Q    Page 2 of Defendant's 2, which is your

6    unemployment statement.

7        A    Okay, you are talking about this one?

8        Q    Yes.  For the record, you are looking at the Fact

9    Finding Report, your Rebuttal, correct?

10       A    Where are you?  Rebuttal.

11       Q    At the top it says Fact Finding Report?

12       A    Right.

13       Q    And Rebuttal, correct?

14       A    Right.

15       Q    Okay, I want to direct your attention to the third

16   paragraph, the second sentence.  Could you read that for me,

17   please, third paragraph down, the second sentence?

18       A    Okay, "The employer told me that if I failed again

19   I would be fired."

20       Q    Okay, and when was that told to you?

21       A    That was, like I said, in the orientation, the

22   employer, you know, that was explained to everybody in that

23   orientation that that's the way this was going to go down in

24   anything had happened to any individual.

25       Q    So is it fair to say that upon your return to work

1    fired?

2        A    Right.

3        Q    And you are aware that you were being tested for

4    several drugs, not just marijuana, correct?

5        A    Right.

6        Q    Now directing your attention to November of 1999,

7    you underwent a drug test during that month pursuant to this

8    60-month program; isn't that true?

9        A    November, that's after I had returned back to

10   work?

11       Q    Yes, yes.

12       A    Yeah, I believe once a month they were randomly

13   calling me down and testing me.

14       Q    So directing your attention to November 1999 you

15   underwent a drug test during that month as part of this

16   60-month program or protocol, correct?

17       A    Correct.

18       Q    And you passed that drug test?

19       A    Correct.

20       Q    And you filed no grievance with the union about

21   being subjected to that drug test; is that correct?

22       A    Correct.

23       Q    And directing your attention to December of 1999

24   you underwent a drug test pursuant to that 60-month protocol

25   again; is that true?

1      A      Correct.

2      Q      And you passed that drug test?

3      A      Correct.

4      Q      And you did not file any grievance concerning that

5  procedure or being involved in that drug test; is that

6  correct?

7      A      Correct.

8      Q      And directing your attention to January of 2000

9  you underwent a drug test as part of that 60-month protocol

10  during that month, correct?

11      A      Correct.

12      Q      And you passed that drug test?

13      A      Correct.

14      Q      And you did not file any grievance concerning that

15  January drug test?

16      A      Correct.

17      Q      Directing your attention to February 2000 you

18  again underwent a drug test pursuant to that 60-month

19  protocol, correct?

20      A      Correct.

21      Q      And you passed that drug test?

22      A      Correct.

23      Q      And you filed no grievance concerning that drug

24  test?

25      A      Correct.

1      Q    Now directing your attention to March 21st, 2000

2    were you requested to undergo a drug test that day?

3      A    Yes.

4      Q    Did you do so?

5      A    Yes.

6      Q    What were the results of that drug test?

7      A    It came back a positive.

8      Q    For what substance?

9      A    For cocaine.

10     Q    Were you using cocaine?

11     A    No, I was not.

12     Q    I want to show you --

13

14                        (Defendant's Teamsters Exhibit 4:

15                         Marked for Identification.)

16

17   BY MR. CHEVERIE:

18     Q    I want to show you what's been marked for

19   Identification as Teamsters Exhibit 4 and ask you if you can

20   identify that?

21     A    This is the medical stuff from Sikorsky's for the

22   drug testing forms, whatever.

23     Q    Right.  Directing your attention to the front

24   cover sheet again, Step No. 4, was that completed by you,

25   the bottom third of the page?

1    A    Yes.

2    Q    That's your signature?

3    A    Yes.

4    Q    And the date is March 21, 2000, correct?

5    A    Correct.

6    Q    I want to again flip to the fifth page of this

7    exhibit and again looking at the box concerning the urine

8    test, three down, what is the result?

9    A    Positive for cocaine.

10    Q    Directing your attention to the asterisk under

11    that, that's the same confirmation that was on the earlier

12    test, correct?

13    A    Correct.

14    Q    And this time did you request a split sample, that

15    the split sample also be tested?

16    A    Yes, I did.

17    Q    I want to turn to the next page and directing your

18    attention to the questionnaire where it says, three up from

19    the bottom, "Review rights and procedures of retesting split

20    sample," you did request a split sample; is that correct?

21    A    Yes, I did.

22    Q    I want you to turn to the last page of the

23    exhibit.

24    A    Okay.

25    Q    There's the confirmation that you requested -- the

1   last page, sir.  Did you not get the --

2       A    Oh, I am sorry.

3       Q    That's the confirmation of the split sample that

4   you requested; isn't that true?

5       A    This is the first time I've ever seen this.  I was

6   never shown this before.  Also I was never, as stated,

7   charged for the second test which was supposed to be, it's

8   in writing that it would be, I would be charged for it if it

9   came back positive; I was never showed any medical or

10  documentation from the laboratory until now and this is my

11  job that was on the, you know --

12      Q    No question.

13      A    -- it's my livelihood.  I never seen any of this.

14      Q    Prior to coming here today, did you review these

15  documents with your attorney?

16      A    We talked.

17      Q    I am sorry, I don't want to get into what you

18  talked about but these documents were turned over some time

19  ago.  You've never seen this document before today?

20      A    I didn't see this, no.

21      Q    Now directing your attention to April 4th, 2000,

22  did you, in fact, file a grievance that day?

23      A    Yes.

24                    (Defendant Teamster Exhibit 5:

25                     Marked for identification.)

1                pre-employment drug test, as they called it.

2    BY MR. CHEVERIE:

3        Q    But isn't it true that you previously testified I

4    believe that everybody that went to your orientation, which

5    was 40 people, they were all going to be drug tested?

6        A    Correct.

7        Q    Now your next sentence says, "In addition, the

8    drug testing was not performed in conformity with proper

9    testing standards."

10               What evidence do you have, sir, that these tests

11   were not performed in conformity with proper testing

12   standards?

13       A    I -- I -- I don't know.

14       Q    You have no evidence of that?

15       A    No, not to my -- not to my knowledge.

16       Q    So that's not a correct response?

17                        MR. BOCHANIS:  I will object to that.

18                        MR. CHEVERIE:  You can answer, sir.

19   BY MR. CHEVERIE:

20       Q    As far as you know?

21       A    As far as I am not saying yeah, but I just, I

22   don't know, just -- wait a minute.  Not that I could say,

23   no, not that I could say, no.

24       Q    The next two sentences state, "The Defendant,

25   Sikorsky did not have just cause to terminate my employment.

1                    MR. CHEVERIE:  Okay, I will leave it in,

2          sir.

3   BY MR. CHEVERIE:

4      Q    You were advised you were going to be doing FAA

5   work, correct?

6      A    Right, at one point.

7      Q    And you were given a test pursuant to the fact

8   that you were scheduled along with a pool of other people to

9   do FAA work, correct?

10     A    Right.

11     Q    And you were tested pursuant to that policy,

12  correct?

13     A    Right.

14     Q    And you failed that?

15     A    Right.

16     Q    And you failed a second?

17     A    Right.

18     Q    What progressive discipline do you believe you

19  were entitled to?

20     A    Being rehabilitated for whatever the second time,

21  I wasn't, when they did the first time.  They just walked me

22  out the door like I was a total stranger who didn't belong

23  there.

24     Q    So was it your testimony that the second time when

25  you got a positive for cocaine you should have been

1    rehabilitated for cocaine; is that your understanding, is

2    that what you thought?

3        A    That's --

4        Q    Suppose a third time you were taken and it was

5    heroin, should you be given another time to clean up for

6    heroin?

7        A    I would imagine each drug is a different way to

8    take care, you know, to help somebody with, like I explained

9    to you before.

10       Q    And so if you get addicted to Oxycontin, would you

11   be given another test, another chance to rehab; is that your

12   understanding?

13       A    Well, that's basically the same as heroin, it's an

14   opiate, it falls under the, it would be the same thing.  And

15   back to that, that's why I was mistreated unfairly, because

16   at the time of the, me going to the union and complaining

17   about what's going on and there was other cases, the other

18   cases which were the Oxycontin people who were caught doing

19   Oxycontin in the company on company time were all given

20   their jobs back with back pay, nine that I know of, and

21   they're -- thing was they weren't offered any rehabilitation

22   for their substance abuse of whatever the heck was going on

23   with them, similar drugs in Sikorsky Aircraft, whether any

24   of them fell under FAA or not; also supervision was involved

25   in that, you know, that's why I felt I was treated miss --

```
 1    unfair and different than others.  Also the fact that in
 2    this pre-testing, so-called pre-employment testing at one
 3    point some of the 40 people were complaining about it being
 4    so sudden that if anybody had a problem or they wanted to
 5    clean up if they were using whatever, the union did get
 6    granted a 30-day period for people that just do whatever
 7    they had to do, whatever the problem was, which I was tested
 8    before the 30-day period if I felt like my little bit of
 9    marijuana use was going to make me lose my job.
10         Q    Did you file a grievance because you weren't given
11    that 30-day grace period?
12         A    No, I was already caught and positive, I went
13    through the program.
14         Q    Did you file a grievance, sir, "yes" or "no"?
15         A    No, I didn't, no.
16         Q    And isn't it true that you could have requested
17    time prior to your test to clean up; isn't that true?
18         A    I didn't -- have no idea of that until people
19    started complaining.
20         Q    Harvey Jackson didn't advise you?
21         A    No, this was after the fact that I was tested.  I
22    was one of the first groups to go down and that's when
23    everybody started going wild about it and --
24         Q    As you sit here today, sir, are you aware of any
25    person involved in the Oxycontin case that failed two
```